Holley E. VAN OSDOL, Petitioner,

v.

Hugh Frederick VOGT, individually and in his capacity as an agent of the Mile Hi Church of Religious Science; the Mile Hi Church of Religious Science, a Colorado non-profit corporation; and the United Churches of Religious Science, a California corporation, Respondents.

No. 94SC646.

Supreme Court of Colorado,
En Banc.

Jan. 16, 1996.

Feiger, Collison & King, P.C., Lynn D. Feiger, Madeline A. Collison, Darold W. Killmer, Theresa L. Corrada, Denver, for Petitioner Holley E. Van Osdol.

Quigley & Bruce, Neil Quigley, William C. Ritter, Denver, for Mile Hi Church of Religious Science.

White and Steele, P.C., Sandra Spencer Coleman, Denver, for United Churches of Religious Science

Law Firm of Leonard M. Chesler, P.C., Leonard M. Chesler, John S. Tatum, Denver, for Hugh Frederick Vogt.

Justice KOURLIS delivered the Opinion of the Court.

Petitioner Holley E. Van Osdol challenges the dismissal of her retaliation claim under Title VII, 42 U.S.C.2000e–3 (1988 & Supp. V 1993), and certain of her intentional tort claims against the respondents Hugh Frederick Vogt, Mile Hi Church of Religious Science, and the United Churches of Religious Science. The trial court found that the claims were precluded by the First Amendment to the United States Constitution and dismissed them under C.R.C.P. 12(b)(1) and (5). The court of appeals upheld the dismissal of the claims. We affirm and remand with directions.

### I.

Hugh Frederick Vogt was a past president of the United Churches of Religious Science (UCRS) and a past member of the governing body of UCRS, known as the Ecclesiastical Committee. He was a senior minister at the Mile Hi Church of Religious Science (Mile Hi), and had a television ministry that aired throughout Colorado.

From 1968 to 1975, when Van Osdol was a child, she lived with her mother and Vogt. At that time, Vogt was married to her mother and was her stepfather. Van Osdol alleges that for years during her childhood, Vogt subjected her to sexual abuse. Van Osdol claimed the sexual abuse ended in 1975 when Van Osdol, then seventeen, moved out of her mother's home.

Some sixteen years later, in 1991, Van Osdol was serving as a minister for UCRS in Washington state. She moved to Denver and in early 1992 submitted a proposal to the Ecclesiastical Committee to open a new Church of Religious Science in southern metropolitan Denver. In May of 1992, the Ecclesiastical Committee informed Van Osdol that they had approved her plans to open the new church and granted her a novitiate minister license in Colorado.

In June of 1992, Van Osdol informed the Ecclesiastical Committee that Vogt had sexually abused her as a child, and that she believed he had sexually harassed a parishioner and several UCRS employees. She requested the Committee's assistance in convincing Vogt that he should pay for her therapeutic treatment, and threatened to publicize her allegations if Vogt did not agree to pay for her therapy.

Vogt responded to Van Osdol's charges with a letter to UCRS' President and Chief Operating Officer denying the charges of sexual abuse and asking the church to begin an investigation of the matter.

In August of 1992, the Ecclesiastical Committee voted to revoke Van Osdol's novitiate minister license and rescind the decision to allow her to open a new church. They notified her of that decision by letter dated September 15, 1992.

Van Osdol brought this action against Vogt, Mile Hi, and UCRS in 1993[1] alleging the following thirteen claims: (1) illegal retaliation by UCRS in violation of 42 U.S.C. § 2000e–3 (1988 & Supp. V. 1993) (Title VII); (2) breach of fiduciary duty by UCRS and Mile Hi; (3) interference with prospective economic advantage by UCRS, Mile Hi, and Vogt; (4) intentional interference with contract by Vogt and Mile Hi; (5) breach of contract by UCRS; (6) promissory estoppel against UCRS; (7) battery against Vogt; (8) assault against Vogt; (9) outrageous conduct against Vogt; (10) breach of fiduciary duty by a person in a position of trust against Vogt; (11) negligent hiring against Mile Hi and UCRS; (12) negligent supervision against Mile Hi and UCRS; and (13) negligent retention of Vogt by Mile Hi and UCRS. The relief she requested included compensatory and punitive damages, back pay, and future pay in lieu of reinstatement.[2]

The trial court denied motions to dismiss on the following six claims: breach of contract by UCRS, promissory estoppel against UCRS, battery against Vogt, assault against Vogt, outrageous conduct against Vogt, and breach of fiduciary duty by a person in a position of trust against Vogt. However, the court granted dismissal on the remaining seven claims, finding them barred by the First Amendment. The trial court granted C.R.C.P. 54(b) certification as to all claims here at issue. Van Osdol appealed the dismissal to the court of appeals, which affirmed the decision of the trial court. *Van Osdol v. Vogt*, 892 P.2d 402 (Colo.App.1994). On certiorari review before this court, Van Osdol challenges only the dismissal of claims one through four.

## II.

We granted certiorari on the following two issues: (1) whether the First Amendment precludes a court from exercising jurisdiction over a minister's tort and Title VII claims against her church and another minister, and (2) whether the "fraud" and "collusion" exceptions to the First Amendment defense are viable claims when a minister is discharged in retaliation for reporting the misconduct of another minister. We hold that the First Amendment precludes our jurisdiction over Van Osdol's Title VII and intentional tort claims and that no fraud and collusion exception to the First Amendment bar exists under these circumstances.

## III.

This case involves a conflict between Title VII and the First Amendment. Title VII, 42 U.S.C. §§ 2000e to 2000e–17 (1988 & Supp. V 1993), is the centerpiece of the Civil Rights Act of 1964. Title VII prohibits employers from discriminating against employees or job applicants with respect to hiring and discharge decisions, or the compensation, terms, conditions, and privileges of employment, based upon the employee/applicant's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). Under Title VII, sexual harassment is considered sexual discrimination. Therefore, 42 U.S.C. § 2000e–3 prohibits an employer from retaliating against an employee for reporting or opposing employment practices made illegal under Title VII, including sexual harassment.

Section 702, 42 U.S.C. § 2000e–1, exempts religious corporations, associations, educational institutions, or societies from the requirements of Title VII in the limited area of religious discrimination[3] such that a reli-

---

1. Issues regarding the applicable statute of limitations on Van Osdol's claims are not before us.

2. At oral argument, counsel informed the court that Van Osdol has been reinstated by UCRS and now has a ministry. That fact does not appear in the record, was not before the trial court or the court of appeals, and therefore plays no part in our analysis.

3. Section 702 applies to foreign corporations and religious entities and states:

   This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform

gious organization is permitted to make hiring and discharge decisions on the basis of an employee/applicant's religious affiliation.[4]

Van Osdol claims that UCRS violated Title VII when it revoked her license and rescinded the decision to allow her to open a new Church of Religious Science. She claims that this constituted illegal retaliation for her report that Vogt had committed sexual harassment. Absent some countervailing bar, such retaliation by an employer would, if proven, be contrary to the provisions of Title VII.

## IV.

■ The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."[5] These words are the source of the Constitution's two branches of religious protection: the Free Exercise Clause and the Establishment Clause. The First Amendment's guarantee of religious protection is made applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

Each of Van Osdol's four claims on appeal arises directly out of UCRS' decision to revoke her novitiate minister license and to rescind the decision to allow her to open a new church.[6] Thus, each claim arises out of

UCRS' choice of whether or not to employ Van Osdol as a minister of its church.

These facts therefore set this case apart from the vast majority of church employment cases involving non-minister hiring and discharge decisions, as well as from cases involving a minister's charges against a church that deal with employment matters separable from doctrinal issues. We conclude that the First Amendment does bar application of Title VII to the facts of this case. The choice of a minister is a unique distillation of a belief system. Regulating that choice comes perilously close to regulating belief.

## V.

Courts have traditionally analyzed the scope of the First Amendment by reference either to the Free Exercise Clause or to the Establishment Clause. Even so, the line between the two clauses can be indistinct and hard to define. Whether the courts should intrude into ecclesiastical decisions regarding choice of a minister is an issue that bridges both religion clauses of the First Amendment, because it potentially involves governmental intrusion into both ecclesiastical and individual decision-making. Hence, both clauses of the First Amendment are implicated and the parallel lines of cases must be examined. However, whether we look to Free Exercise Clause analysis or to Establishment Clause analysis, we find that a

---

work connected with the carrying on by such corporation, association, educational institution, or society of its activities.
42 U.S.C. § 2000e–1(a) (1988 & Supp. V 1993).

**4.** The legislative history of Title VII shows that Congress considered giving religious organizations a blanket exemption from all the requirements of Title VII, but instead decided on a narrower course, exempting religious institutions from the prohibition on religious discrimination only. *See McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir.) (explaining legislative history of § 702), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).

**5.** The Colorado Constitution also guarantees the freedom of religion under Article II, § 4.

**6.** Van Osdol's claims of intentional interference with contract, interference with prospective economic advantage, and breach of fiduciary duty

all relate directly to UCRS' choice of a minister. Each claim requires a showing of causation of harm, which in this case Van Osdol characterizes as substantial economic loss as a result of UCRS' decision to revoke her license and rescind its approval for a new church. *See, e.g., Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995) (interference with quasi-contractual relations to gain economic advantage requires a showing that defendant caused third party not to enter into prospective relationship with plaintiff); *Rupert v. Clayton Brokerage Co. of St. Louis*, 737 P.2d 1106 (Colo.1987) (breach of fiduciary duty requires showing that alleged breach was cause of plaintiff's damages); *Watson v. Settlemeyer*, 150 Colo. 326, 372 P.2d 453 (1962) (intentional interference with contract where defendant's actions caused third party to terminate contract with plaintiff). For a court to determine whether the defendants impermissibly caused plaintiff damage would require the court to examine the reasoning behind UCRS' choice of a minister. As

church's choice of a minister is uniquely protected.

## A.

Traditional free exercise analysis employs a balancing test to determine when a person or religious institution should be granted an exemption from a law that would otherwise require that person or institution to violate their religious beliefs. Under this test, governmental actions that substantially burden a religious practice must be justified by a compelling state interest. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). A court is, therefore, required to weigh the government's interest in enforcing the statute against the detrimental impact the statute would have on a person's religious practices. *See, e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 603–04, 103 S.Ct. 2017, 2034–35, 76 L.Ed.2d 157 (1983). In addition, courts must determine whether the governmental interest may be achieved through an alternative, less restrictive means. *See, e.g., Thomas v. Review Bd.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).

Many courts have used the compelling state interest test in reviewing suits brought by members of clergy regarding clerical appointment decisions by their church employers. Where the clergy member alleges a violation of civil law by the church in the appointment process, courts have repeatedly found that the church's interest in free exercise outweighs the government's interest in enforcing the particular statute. "Because the appointment [to a chaplaincy] is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131 (1929). Secular courts must accept this decision as conclusive, even though it affects civil rights, because it is a purely ecclesiastical matter. *Id.; see also Young v.*

*Northern Illinois Conference of United Methodist Church*, 21 F.3d 184 (7th Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360 (8th Cir.1991); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575 (1st Cir. 1989); *Hutchison v. Thomas*, 789 F.2d 392 (6th Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986).

A leading case using traditional free exercise analysis in a minister choice context is *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164 (4th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). In *Rayburn*, a woman denied a position as an associate in pastoral care in the Seventh-day Adventist Church charged the church with sexual and racial discrimination under Title VII. The Fourth Circuit dismissed the case under both the Free Exercise and Establishment Clauses, finding that the First Amendment barred jurisdiction over the church's choice of a minister. In applying the compelling state interest test in the free exercise portion of the analysis, the court held that judicial interference in the choice of an associate in pastoral care would create an inroad into religious liberty so great that the balance of values weighed conclusively against the government. *Id.* at 1169.

Similarly, *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1355 (D.C.Cir.1990), concerned a Methodist minister who alleged that the United Methodist Church violated various laws, including the Age Discrimination in Employment Act, in denying him a promotion to a better pastoral appointment. The court in *Minker* found that the appointment of a pastor is a determination of "whose voice speaks for the church." *Id.* at 1356. The court held that the First Amendment prohibits judicial review because the appointment of a pastor "is *per se* a religious matter." *Id.* at 1355–57.[7] This is so even if the

---

our holding today explains, such inquiry is barred.

7. We note that UCRS set forth as an affirmative defense that its decisions regarding Van Osdol were made in part for ecclesiastical reasons.

Van Osdol challenges this as a pretext and urges this court to investigate the true reasons for the actions taken against her. We decline to do so because church authority over choice of a minister is beyond the scope of permissible govern-

church adopts its own idiosyncratic reasons or relies on factors that are not independently ecclesiastical in nature.

Underlying the court's decision in *Minker* is a recognition of the link between a church's religious doctrine and its choice of a minister. The court in *Minker* stated that a minister is the "lifeblood" of the church. *Id.* at 1357 (quoting *McClure v. Salvation Army*, 460 F.2d 553, 559 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972)). "The minister is the chief instrument by which the church seeks to fulfill its purpose." *McClure*, 460 F.2d at 559. Because of the minister's unique role in the church, the appointment of a minister is inherently of prime ecclesiastical concern. *Minker*, 894 F.2d at 1357.

Although it mentioned other courts' use of the compelling state interest test in similar situations, the court in *Minker* did not explicitly apply this test. It did hold that, as a threshold matter, the mere maintenance of a suit concerning matters related to a pastoral appointment violates free exercise protection. "We cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the 'gifts and graces' of a minister must be left to ecclesiastical institutions." *Id.*[8]

Under the Free Exercise compelling state interest test as set out in *Rayburn*, or the abbreviated analysis used in *Minker*, the choice of a minister is protected from review by secular courts.

Van Osdol urges that she is merely asking the court to determine if the church's stated ecclesiastical reasons for not hiring her were pretextual, and that this inquiry can be accomplished without analysis of religious doctrine.

However, by challenging UCRS' decision not to hire her as a minister, Van Osdol inevitably leads the court into analysis of UCRS' choice of a minister, even for purposes of a pretextual inquiry. The decision to hire or discharge a minister is itself inextricable from religious doctrine. The great majority of cases find that a minister holds a special and unique position as the leader of the church and the embodiment of the church's religious beliefs. Thus, the church's decision of who to hire as a minister necessarily involves religious doctrine. The decision may involve non-religious reasons as well, but those reasons cannot be separated from the basic belief that a particular person embodies or does not embody the religious beliefs of the church. *See Minker*, 894 F.2d at 1357 (holding that it does not matter whether the factors relied upon by the church were independently ecclesiastical or

mental inquiry. Even if the reasons on which UCRS based its decisions were secular, because they were applied to the choice of a minister, they become inextricable from belief. *See Scharon*, 929 F.2d at 363.

**8.** The plaintiff in *Minker* brought an employment discrimination and a contract claim against the church. The court treated these separate claims differently. With regard to the discrimination claims, *Minker* unequivocally held that the First Amendment barred any inquiry into the church's determination of the plaintiff's suitability for a different pastorship. It also held that the First Amendment barred even a hearing into whether the church's reasons for not appointing the pastor to a new pastorship were pretextual. *Minker* 894 F.2d at 1357. As stated above, its reasoning for these findings was that "the assignment of a minister is inherently of prime ecclesiastical concern," and hence, there was no possibility of addressing the issue without analysis of church doctrine. *Id.*

Nevertheless, *Minker* found that to grant summary judgment on the pastor's contract claim would be premature because the contract claim

had the potential to be addressed without inquiry into religious doctrine. The court found that hearing the pastor's contract claim might require determination of the following purely factual issues: whether a promise of a more suitable congregation was made, whether consideration was given for that promise, and whether such congregations became available but were not offered to the pastor.

Like the hiring or discharge decisions regarding non-clergy employees, because the contract claim had the potential to be settled without analysis of church doctrine, it was not automatically barred by the First Amendment. *Minker* did recognize the possibility that the contract claim could involve inquiry into ecclesiastical policy, depending on the facts, in which case the trial court might have to dismiss the case. *Minker*, 894 F.2d at 1360–61. Here, Van Osdol's contract claims against UCRS and her personal tort claims against Vogt also may be addressed without resort to ecclesiastical policy. Consistent with *Minker*, these claims were not dismissed and are not before us.

not, for since they relate to a pastoral appointment decision they are automatically intertwined with religious doctrine).

Cases permitting pretextual inquiries in other contexts take respectful note of the distinction between a minister choice case and any other type of employment case involving a religious institution. For example, *Geary v. Visitation of the Blessed Virgin Mary Parish School,* 7 F.3d 324 (3d Cir. 1993), concerned a lay teacher at a parochial school. The court went into a lengthy discussion distinguishing the case from cases involving the hiring or discharge of a minister, and concluded that in the case before it, "a court could adjudicate Geary's claims without the entanglement that would follow were employment of clergy or religious leaders involved." *Geary,* 7 F.3d at 331. Similarly, in *DeMarco v. Holy Cross High School,* 4 F.3d 166 (2d Cir.1993), the court specifically distinguished its own holding allowing a pretextual hearing for a lay teacher's discrimination claim from cases dealing with "the pervasively religious relationship between a member of the clergy and his religious employer." *DeMarco,* 4 F.3d at 171. *But cf. Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468 (8th Cir.1993) (holding that First Amendment did not bar inquiry into minister's employment related tort claims against his church).

*Geary* and *DeMarco* allowed pretextual hearings because those cases involved situations where there was a possibility that the employee could prove his or her claim without resort to analysis of church doctrine. This may be possible in a case involving a lay teacher, a choir director, a church secretary, an organist, or other employees of a religious organization,[9] but it is not possible in a case involving the choice of a minister.

Allowing a pretextual hearing in a minister choice case inevitably encourages sophistry and leads a court nowhere. Once the church states that the decision was, even in part, doctrinal,[10] then the court would either have to invoke the First Amendment and cease inquiry or enter into the impermissible activity of analyzing church doctrine and perhaps weighing the importance of a particular area of the doctrine.

Our holding does not bar the large number of non-clergy employees from suing the church on discrimination claims. It does not even bar ministers from bringing employment discrimination claims that do not stem directly from a hiring or discharge decision.[11] Instead, our holding recognizes a small, inviolable area in which the decision of a church is not subject to governmental scrutiny.

**B.**

 Van Osdol argues that the compelling state interest test has been displaced by the United States Supreme Court decision in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). She further argues that, after *Smith,* UCRS' minister choice is no longer insulated from judicial review. We disagree.

In *Smith,* the Supreme Court held that the Free Exercise Clause did not prohibit the state of Oregon from making the use of peyote, an hallucinogenic drug, a criminal act and from denying unemployment benefits to employees discharged for such use, even when the respondents claimed that their use of peyote was for sacramental purposes at a religious ceremony. The Court concluded that an individual may not find shelter be-

9. *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), heavily relied upon by Van Osdol, does not support her position because it involves a teacher and a parochial school, not a minister and a church. In addition, the *Dayton* decision does *not* turn on an analysis of the First Amendment or employment discrimination; rather, it focuses on issues of federalism and comity.

10. In this case, UCRS alleged as an affirmative defense in its Answer that the decision to revoke Van Osdol's license was made for ecclesiastical and business reasons. UCRS Answer, Fourth Affirmative Defense.

11. As Justice Mullarkey states in her concurrence, if Van Osdol had brought a claim regarding a hostile work environment instead of claims directly related to the church's decision not to hire her, such a claim might have survived a First Amendment bar.

hind the First Amendment from a neutral law of general applicability "on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879, 110 S.Ct. at 1600 (citing *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)).

*Smith* disapproved the use of the compelling state interest test in free exercise cases,[12] and focused instead on the presumption that a neutral, generally applicable law prevails over claims of religious exemption.

Van Osdol argues that Title VII is just such a generally applicable law and that under *Smith,* UCRS should not be insulated from its mandate, or at a minimum, should not be insulated from the court's determination of whether the ecclesiastical reason stated for revoking her novitiate minister license and rescinding the decision to allow her to open a new church was genuine or merely a pretext.

*Smith* is not a case involving the choice of a minister by a religious entity. It is a case that arises out of the criminal usage of drugs. Whether or not *Smith* represents a departure from traditional free exercise analysis, we believe that the reasoning underlying *Smith* supports the conclusion in a minister choice case that we reach today.[13]

The gravamen of *Smith* is that it is not the position of a judge to decide what a person's belief system is or should be, or how impor-

tant those beliefs are to that person. *Id.* at 886–87, 110 S.Ct. at 1604–05.[14]

"[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner,* 490 U.S. [680] at 699 [109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989)]. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.

*Id.* at 887, 110 S.Ct. at 1604.

It is this underlying reason that leads the *Smith* majority to conclude that the compelling interest test should not be applied to allow exemptions based on a person's system of religious beliefs. "[I]t is horrible to contemplate that federal judges will regularly balance against the importance of general laws the significance of religious practices." *Id.* at 889–90 n. 5, 110 S.Ct. at 1606 n. 5. Applying the compelling state interest test to free exercise claims would constantly require judges to weigh the importance of a person's system of religious beliefs against the importance of a particular statute and it is this act that the Court finds "contradicts both constitutional tradition and common sense." *Id.* at 885, 110 S.Ct. at 1603.

Under the *Smith* facts, consideration of whether or not to grant an exemption would require the judge to weigh the importance of individuals' beliefs concerning the use of pey-

**12.** Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb–4 (Supp.1993), in response to *Smith.* RFRA requires courts to apply the compelling state interest test to laws that burden the practice of religion. The constitutionality of RFRA is being tested in the federal courts, but has not yet been addressed by the United States Supreme Court. Regardless, RFRA is not applicable to these facts because it was not in effect when the events took place which form the basis of Van Osdol's complaint.

**13.** Most of the minister choice cases post-dating *Smith* do not even cite *Smith,* but rather continue to apply traditional free exercise analysis, or Establishment Clause analysis, or both. *See, e.g., Young,* 21 F.3d 184 (7th Cir.) *cert. denied,* —— U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994); *Scharon,* 929 F.2d 360 (8th Cir.1991); *EEOC v.*

*Catholic Univ. of America,* 856 F.Supp. 1 (D.D.C. 1994). *But cf. Black v. Snyder,* 471 N.W.2d 715 (Minn.App.1991) (holding that *Smith* would argue for the application of Title VII to a minister choice case, but Establishment Clause analysis prevents such a result), *review denied,* (Minn. Aug. 29, 1991). The courts appear to presume that the choice of a minister is protected under the rationale of cases following *Serbian Eastern Orthodox Diocese for the United States & Canada v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), and *Minker,* 894 F.2d 1354, which were not overruled or even mentioned in *Smith.*

**14.** In a similar sense, the *Smith* majority noted that it is improper for a judge to determine the "importance" of a speaker's ideas when weighing a free speech claim. *Smith,* 494 U.S. at 887, 110 S.Ct. at 1604.

ote as part of their traditional religious practices against the state's interest in the criminal prohibition of peyote use. Thus, the judge would be required to determine what the person's belief system is and how central a particular practice is to that belief system. The majority in *Smith* would have the courts avoid such impermissible analysis by applying the law uniformly and disallowing exemptions based on religion.

A minister choice case requires a different result. Applying Title VII or any anti-discrimination law to a church's choice of a minister would require a judge to question the belief system of the church, to validate certain interpretations of the religious doctrine over others, or to compel the church to accept certain ideas into their belief system. All of these actions clearly fall into the unacceptable realm of judicial evaluation of religious belief. Hence, the reasoning in the *Smith* case argues for one result when applied to a felony drug law and quite another when applied to a church's choice of its minister. It would be impossible for a court to apply Title VII and evaluate the propriety of a minister hiring or discharge decision without evaluating the beliefs behind that decision.

We find the facts of *Smith* distinguishable. We further find that the rationale driving the decision in *Smith* would itself protect UCRS' decision regarding Van Osdol from application of Title VII.

## VI.

In addition to the Free Exercise Clause, various courts have relied upon the Establishment Clause to protect a church's choice of a minister from court intervention. These courts have concluded that government intervention in the choice of a minister violates the Establishment Clause by creating excessive government entanglement with religion.

■■■ The Establishment Clause prohibits "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). The long standing test used to determine whether a statute is in violation of the Establishment Clause was set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The *Lemon* test requires a government regulation to: (1) have a secular purpose, (2) neither advance nor inhibit religion as its primary effect, and (3) not foster excessive entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111.[15] A government regulation that fails to satisfy the test is in violation of the Establishment Clause. The prong of the test concerning us in this case is the third: excessive entanglement.

■■■ The courts have historically recognized that "both religion and government can best work to achieve their lofty aims if each is left free of the other within its respective sphere." *McCollum v. Board of Educ.,* 333 U.S. 203, 212, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948). "[R]eligious freedom encompasses the 'power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Serbian Eastern Orthodox Diocese for the United States & Canada v. Milivojevich,* 426 U.S. 696, 721–22, 96 S.Ct. 2372, 2386, 49 L.Ed.2d 151 (1976) (quoting *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952)). "The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a

---

**15.** A more recent case, *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), has been interpreted as creating a new Establishment Clause test known as the coercion test. This test questions whether the government is coercing individuals by requiring support of or adherence to a particular religious belief or practice before being allowed benefits to which they are otherwise entitled. However, the *Weisman* opinion explicitly refused to reconsider the *Lemon* test and instead confined its holding to cases in which government creation of a state-sponsored and state-directed religious exercise in a public setting was seen as "an attempt to employ the machinery of the state to enforce a religious orthodoxy." *Weisman,* 505 U.S. at 592, 112 S.Ct. at 2658. Thus, since our analysis concerns government restriction on actions of UCRS, and not some form of improper subsidization or support of UCRS, the *Lemon* test continues to apply.

civil magistrate." *Engel v. Vitale,* 370 U.S. 421, 431–32, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962) (quoting Memorial and Remonstrance against Religious Assessments, II Writings of Madison, 183, 187). While some government entanglement with religion is inevitable, excessive entanglement is constitutionally impermissible. *See Walz,* 397 U.S. at 674, 90 S.Ct. at 1414. In rhetorical terms, we must "take the political hands of Caesar off of the institutions of God...." *King's Garden, Inc. v. F.C.C.* 498 F.2d 51, 54 n. 6 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974).

To determine whether government entanglement with a religious organization is excessive, a court must consider the character and purpose of the institution involved, the nature of the regulation's intrusion into religious administration, and the resulting relationship between the government and the religious authority. *Lemon,* 403 U.S. at 614–15, 91 S.Ct. at 2112.

The United States Supreme Court has held that claims involving "core" questions of church discipline and internal governance are insulated from judicial review.[16] *See Milivojevich,* 426 U.S. at 717, 721, 96 S.Ct. at 2384, 2386. In *Milivojevich,* the Court was faced with an internal theological dispute over control of a church by different sects and with the decision to defrock the church's bishop. The Court found that the bishop is "the embodiment of the church" within his diocese and the "chief representative and guiding leader of all church spiritual life and order in the diocese." *Id.* at 717, 96 S.Ct. at 2384. It found that the bishop is one of the central figures in the church hierarchy, the composition of which is at "the core of ecclesiastical concern." *Id.*

From these determinations the Court concluded that temporal courts have no jurisdiction over "quintessentially religious controversies" such as this. *Id.* at 720, 96 S.Ct. at 2385. *Milivojevich* has stood as the seminal case in protecting minister choice decisions from judicial review. Since *Milivojevich,* many courts have held that claims concerning the choice of a minister are precluded because the core ecclesiastical nature of the decision would require excessive government entanglement with the church. *See Geary v. Visitation of the Blessed Virgin Mary Parish Sch.,* 7 F.3d 324, 330–31 (3d Cir.1993); *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 171–72 (2d Cir.1993); *Scharon,* 929 F.2d at 362–63; *Minker,* 894 F.2d at 1360; *Natal v. Christian & Missionary Alliance,* 878 F.2d 1575, 1577 (1st Cir.1989); *Rayburn,* 772 F.2d at 1169–71.

The principle underlying the reasoning in all of these cases is that the appointment of a minister is an expression of the beliefs of the church and the "embodiment" of the religion. *Milivojevich,* 426 U.S. at 717, 96 S.Ct. at 2384. "It is axiomatic that the guidance of the state cannot substitute for that of the Holy Spirit and that a courtroom is not the place to review a church's determination of 'God's appointed.'" *Rayburn,* 772 F.2d at 1170. In analyzing a church's choice of a minister, attempts to separate arguably impermissible discriminatory grounds for a decision from grounds stemming from the church beliefs excessively entangles a court with religion.[17] Hence, the

---

**16.** Compare to *Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990), in which a religious corporation brought suit alleging that application of sales and use tax to its sale of religious materials created excessive government entanglement in violation of the Establishment Clause. *Id.* at 394, 110 S.Ct. at 698. The Court found in part that because the nature of the entanglement was administrative instead of requiring inquiry into religious doctrine, the entanglement was not of constitutional importance and thus did not violate the Establishment Clause. *Id.* at 397, 110 S.Ct. at 699.

**17.** While claims for illegal hiring or discharge of a minister inevitably involve religious doctrine, that is not the case for a claim of negligent hiring of a minister. The claim of negligent hiring is brought after an employee has harmed a third party through his or her office of employment. An employer is found liable for negligent hiring if, at the time of hiring, the employer had reason to believe that hiring this person would create an undue risk of harm to others. *Connes v. Molalla Transp. System, Inc.,* 831 P.2d 1316, 1321 (Colo. 1992); Restatement (Second) of Agency § 213 cmt. d (1958). Hence, the court does not inquire into the employer's broad reasons for choosing this particular employee for the position, but instead looks to whether the specific danger

Establishment Clause insulates a religious institution's choice of a minister from judicial review.

## VII.

■ Van Osdol petitions this court to apply a "fraud or collusion" exception to the First Amendment bar on judicial review of UCRS' choice of a minister. We decline to find that such an exception exists in this case.

The source of the suggested fraud or collusion exception arises out of dicta appearing in United States Supreme Court cases. *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131 (1929), introduced the possibility of such an exception by stating that "in the absence of fraud, collusion or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before secular courts as conclusive...." *Gonzalez* concerned an appointment to a chaplaincy in the Catholic Church, in which the court found "not even a suggestion that [the Archbishop] exercised his authority arbitrarily" in making the choice. *Id.* at 18, 50 S.Ct. at 8.

The reference in *Gonzalez* to a fraud, collusion or arbitrariness exception was next discussed by the United States Supreme Court in *Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372. There, the Supreme Court stated that "although references to the suggested [fraud, collusion or arbitrariness] exception appear in opinions ... no decision of this Court has given concrete content to or applied the 'exception.'" *Id.* at 712, 96 S.Ct. at 2382. In *Milivojevich*, the Illinois Supreme Court had concluded that a church's decision to defrock a bishop was arbitrary because the church had not followed its own internal laws. For this reason, the Illinois Supreme Court intervened in the church's internal religious dis-

pute. The United States Supreme Court overruled the Illinois court, holding that there existed no arbitrariness exception to the First Amendment bar to judicial review of an ecclesiastical decision. *Id.* at 713, 96 S.Ct. at 2382. The Court further held that allowing an arbitrariness exception would be inconsistent with the constitutional mandate that courts must accept church decisions on essentially ecclesiastical matters. *Id.*

*Milivojevich* addressed the arbitrariness exception directly, but did not analyze the propriety of any fraud or collusion exceptions since the Illinois court's decision had been based on a finding of arbitrariness only. However, the reasoning found in *Milivojevich* regarding the impropriety of an arbitrariness exception applies equally to a fraud or collusion exception. As the *Milivojevich* court stated, "[I]t is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." *Id.* at 714–15, 96 S.Ct. at 2382–83. In order to determine whether a church employed fraudulent or collusive tactics in choosing a minister, a court would necessarily be forced to inquire into the church's ecclesiastical requirements for a minister. The First Amendment makes such inquiry into religious beliefs impermissible. *See Kaufmann v. Sheehan*, 707 F.2d 355, 358–59 (8th Cir.1983) (finding that even though there may be some secular aspects to the priesthood, claims for fraud or collusion that relate to a person's status as a priest are unrelated to secular purposes but instead go to the heart of internal matters of faith and thus, no fraud or collusion exception is available); *see also Hutchison v. Thomas*, 789 F.2d 392, 395 (6th Cir.) (refusing to find a fraud or collusion exception based on the firm policy protecting First Amendment rights that prohibits inquiry into ecclesiastical decisions absent the most unusual circum-

---

which ultimately manifested itself could have reasonably been foreseen at the time of hiring. This inquiry, even when applied to a minister employee, is so limited and factually based that it can be accomplished with no inquiry into religious beliefs. *See Moses v. Diocese of Colo.*, 863 P.2d 310, 320–21 (Colo.1993) (holding that although courts must not become embroiled in

interpreting or weighing church doctrine, a claim of negligent hiring of a minister is actionable because it does not require such interpretation or weighing of religious belief but instead is merely application of a secular standard to secular conduct), *cert. denied,* — U.S.——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994).

stances), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986).

The inherently ecclesiastical nature of the choice of a minister is logically inconsistent with a fraud or collusion exception to the First Amendment's bar on judicial review of UCRS' decisions regarding Van Osdol and we decline to adopt such an exception.

## VIII.

In employment discrimination cases such as this, the conflict between public law and religious freedom is extremely difficult to resolve. Society has a significant interest in assuring that discrimination and impermissible retaliation do not occur.

Nonetheless, whether we rely upon a compelling state interest test, upon the rationale of *Smith,* or upon the excessive entanglement analysis of the Establishment Clause, we reach the conclusion that UCRS' choice to revoke Van Osdol's novitiate minister license and to rescind permission for her to open a new Church of Religious Science is protected under the First Amendment. Therefore, the district court was precluded from taking jurisdiction over any of the four claims at issue. Each of these claims, while setting forth differing claims against differing parties, focuses on UCRS' choice not to extend membership into its clergy to Van Osdol.

We do not by this opinion hold that churches are insulated from the law. We do not address various claims that could be brought by a minister against his or her church.[18] We also do not address the question of non-clergy employee hiring or discharge decisions.[19]

What we do hold is that a church's choice of who shall serve as its minister is inextricably related to religious belief and therefore invokes the protection of the First Amendment. We affirm the court of appeals and return this case to the court of appeals to remand to the district court for further proceedings consistent with this opinion.

MULLARKEY, J., concurs, and SCOTT, J., joins in the concurrence.

VOLLACK, C.J., dissents.

Justice MULLARKEY concurring:

The majority holds that Holley Van Osdol's retaliation claim, pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–17 (1988 & Supp. V 1993), and certain of her intentional tort claims against the United Churches of Religious Science, Mile Hi Church of Religious Science, and Hugh Frederick Vogt, are precluded by the First Amendment to the United States Constitution and were properly dismissed by the trial court under C.R.C.P. 12(b)(1) and (5). It also holds that the First Amendment does not preclude all employment related claims brought by a minister against her church. Maj. op. at 1134 n. 18 and accompanying text.

---

18. *See, e.g., Minker,* 894 F.2d at 1360 (holding First Amendment not a bar to pastor's claims that do not create excessive entanglement with religion); *Marshall v. Munro,* 845 P.2d 424, 428 (Alaska 1993) (finding First Amendment does not bar claims that do not require determination of whether plaintiff was qualified to be a pastor); *Welter v. Seton Hall Univ.,* 128 N.J. 279, 608 A.2d 206, 214 (1992) (holding that employee's status as a cleric does not preclude her secular claims, rather, the court must abstain only when issue is whether person should serve in a "ministerial function"); *Black v. Snyder,* 471 N.W.2d 715, 720 (Minn.Ct.App.1991) (dismissing claims related specifically to factors of appointment and discharge of associate pastor but allowing associate pastor's claim regarding predischarge sexual harassment to stand), *review denied,* (Minn. Aug. 29, 1991).

19. *See, e.g., Geary v. Visitation of the Blessed Virgin Mary Parish Sch.,* 7 F.3d 324 (3d Cir.1993)

(allowing court jurisdiction since teacher's employment discrimination claims would not involve the entanglement required in a situation involving employment of clergy); *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166 (2d Cir.1993) (distinguishing lay teacher's employment discrimination claim against religious employer from those brought by members of the clergy); *E.E.O.C. v. Pacific Press Publishing Ass'n,* 676 F.2d 1272 (9th Cir.1982) (applying employment law to editorial secretary at a church-run publishing house); *E.E.O.C. v. Southwestern Baptist Theological Seminary,* 651 F.2d 277 (5th Cir. 1981) (applying Title VII to administrative and support staff at seminary), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *E.E.O.C. v. Mississippi College,* 626 F.2d 477 (5th Cir.1980) (applying Title VII to promotion of secular teacher in religious educational institution), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981).

The majority directs the court of appeals to remand to the district court for further proceedings consistent with its opinion. Maj. op. at 1134.

I agree with the majority's interpretation. However, I write separately to make explicit that, on remand, Van Osdol may be able to amend her complaint to state a claim which comes within the parameters of permissible claims recognized by the majority. From my review of the complaint, it appears that Van Osdol may have a claim under the rationale of *Black v. Snyder,* 471 N.W.2d 715 (Minn. Ct.App.1991), *review denied,* (Minn. Aug. 29, 1991), a case upon which the majority relies. Maj. op. at 1134 n. 18.

In *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Supreme Court held that a hostile work environment caused by sexual harassment is a form of actionable sex discrimination under Title VII. Subsequently, in *Harris v. Forklift Sys., Inc.,* 510 U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993), the Supreme Court explained that a hostile or abusive work environment "can be determined only by looking at all the circumstances" which may include:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.

*Id.* at ——, 114 S.Ct. at 371.

Such an analysis does not require inquiry into intrinsically ecclesiastical concerns as would be the case if a court examined minister hiring and discharge decision-making which is at the heart of Van Osdol's retaliation claim. Evaluation of whether a hostile work environment exists does not impinge on core religious beliefs such that either the free exercise of religion is affected or there is threat of excessive governmental entanglement. The First Amendment defense to a claim based on a hostile work environment caused by sexual harassment must fail.

In *Black v. Snyder,* 471 N.W.2d 715, the Minnesota Court of Appeals considered a number of claims brought by a female associate pastor, Susan Black, against her supervising pastor and the church. Black alleged that her supervisor had sexually harassed her and that she had reported the harassment to the proper internal church authorities but to no avail. Shortly thereafter, Black was discharged. Black then brought suit alleging sexual harassment and retaliation under state human rights laws, breach of contract, defamation, and wrongful termination. After reviewing the pertinent case law, the Minnesota Court of Appeals held that Black's breach of contract, retaliation, and whistle blower claims were fundamentally connected to issues of church doctrine and governance because they related specifically to factors of appointment. *Id.* at 721.

However, the *Black* court permitted the plaintiff to maintain her claim for sexual harassment under the Minnesota Human Rights Act because the claim was related to pre-discharge conduct on the part of the defendants and the sexual harassment claim did "not involve scrutiny of church doctrine, interfere in matters of an inherently ecclesiastical nature, or infringe upon the church's religious practice." *Id.* at 721; *see also* Joanne C. Brant, *"Our Shield Belongs to the Lord": Religious Employers and a Constitutional Right to Discriminate,* 21 Hastings Const. L.Q. 275, 296–97 (1994) (there are exceptions to the First Amendment's bar of actions brought by clergy members against their churches when "proof of the employer's wrongdoing can be accomplished without inquiring into religious doctrine").

Invoking a similar rationale, we have permitted tort actions against churches and clergy members under circumstances where clergy members have entered into sexual relations with female parishioners while in the process of counseling the parishioners. *See Moses v. Diocese of Colo.,* 863 P.2d 310, 321 (Colo.1993) ("Civil actions against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported

by competent evidence in the record."), *cert. denied,* —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994); *Destefano v. Grabrian,* 763 P.2d 275, 284 (Colo.1988) ("When the alleged wrongdoing of a cleric clearly falls outside the beliefs and doctrine of his religion, he cannot avail himself of the protection afforded by the first amendment.").

Under the *Black* analysis, and under *Moses* and *Destefano,* a claim for hostile work environment sexual harassment survives a First Amendment challenge. Here, Van Osdol alleges that Vogt sexually harassed church employees and a parishioner. She claims that the church hierarchy rebuffed her reports of the sexual harassment and failed to take appropriate remedial measures. Whether the alleged sexual harassment amounts to a hostile work environment is initially a matter of pleading to be decided by Van Osdol and, if pled, it becomes a matter for resolution by the trial court. Accordingly, I respectfully concur in the court's opinion.

SCOTT, J., joins in this concurrence.

Chief Justice VOLLACK dissenting:

The majority holds that the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution deprive Colorado courts of jurisdiction to adjudicate Van Osdol's (the petitioner) Title VII claim against the United Churches of Religious Science (UCRS), Mile Hi Church of Religious Science (Mile Hi), and Hugh Frederick Vogt (Vogt) (collectively referred to as the respondents). I dissent because the First Amendment does not preclude Van Osdol's claim.

## I.

The facts alleged in the petitioner's amended complaint are as follows.[1] Respondent Vogt is a past president of the United Churches of Religious Science (UCRS), and a previous member of the UCRS governing board, the "Ecclesiastical Committee." Vogt also has a television ministry which is viewed widely throughout the state of Colorado. Additionally, Vogt is the Senior Minister of the Mile High Church of Religious Science.

In 1968, Vogt married Van Osdol's mother, now known as June Kelly. Vogt thus became Van Osdol's stepfather. Between 1968 and 1975, when Van Osdol was a minor, Vogt subjected Van Osdol to repeated sexual abuse and unlawful sexual contact, causing Van Osdol emotional distress. The sexual abuse continued until Van Osdol left home in 1975. Van Osdol did not realize that the sexual abuse perpetrated on her by Vogt was the cause of her emotional distress until she began psychotherapy in 1992.

In May of 1991, Van Osdol was employed by the UCRS as a minister in Renton, Washington. Later that year, she relocated to Denver and proposed to the Ecclesiastical Committee of the UCRS (the Committee) that the UCRS open a new church in south metropolitan Denver. In May of 1992, the Committee informed Van Osdol that they had approved her proposal to open a new church. At the same time, Van Osdol assumed the position of Novitiate Minister with UCRS.

In June of 1992, Van Osdol informed Reverend Kay Hunter, a vice president of UCRS, that Vogt had subjected a female parishioner and female employees to sexual harassment. Also in June of 1992, Van Osdol informed the Committee that Vogt had sexually abused her when she was a minor. Van Osdol sought the assistance of the Committee in obtaining payment from Vogt for Van Osdol's therapeutic treatment.

Later in June, 1992, Vogt wrote to members of the Committee, denying the charges of sexual assault made by Van Osdol, and asking that the UCRS undertake an investigation of Van Osdol. On August 4, 1992, a member of the Committee met with Van Osdol for the purpose of investigating charges that Van Osdol had made false statements regarding Vogt. About a week later, the Committee met and voted to rescind Van Osdol's novitiate license and to terminate her

---

1. As this action is before us pursuant to a motion to dismiss, we must accept all allegations of the complaint as true and construe them strictly against the defendant. *Popovich v. Irlando,* 811 P.2d 379, 385 (Colo.1991).

as a minister with the UCRS. Subsequently, the UCRS notified Van Osdol by letter that the UCRS was rescinding her "pre-church and novitiate license" and that her employment as a minister with the UCRS was terminated.

In March of 1993, Van Osdol filed the instant action against the respondents, alleging: (1) illegal retaliation by the UCRS in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) breach of fiduciary duty against UCRS and Mile Hi; (3) interference with prospective economic advantage by UCRS, Mile Hi, and Vogt; (4) intentional interference with contract by Mile Hi and Vogt; (5) breach of contract against UCRS; (6) promissory estoppel against UCRS; (7) battery against Vogt; (8) assault against Vogt; (9) outrageous conduct against UCRS, Mile Hi, and Vogt; (10) breach of fiduciary duty by Vogt; (11) negligent hiring against UCRS and Mile Hi; (12) negligent supervision against UCRS and Mile Hi; and (13) negligent retention against UCRS and Mile Hi.

The trial court, *inter alia,* granted the respondents' motion to dismiss the claims for retaliation, breach of fiduciary duty, interference with economic advantage, interference with contract, and negligent hiring, supervision, and retention. The trial court held that it lacked jurisdiction, pursuant to the Religion Clauses of the First Amendment, to review the decisions of a church and its officials.

The court of appeals affirmed the trial court's dismissal of the above claims. The court of appeals held that, in order to adjudicate Van Osdol's retaliation claim,

> the trial court would be forced to inquire into the good faith of the position asserted by the UCRS officers in revoking Van Osdol's license and ministry to determine whether their actions were retaliatory in nature, and this type of inquiry is prohibited under the First Amendment.

*Van Osdol v. Vogt,* 892 P.2d 402, 405–06 (Colo.App. 1994). Van Osdol then petitioned this court for a writ of certiorari. We granted certiorari to determine: (1) Whether the First Amendment precludes a court from exercising jurisdiction over a minister's tort and Title VII claims against her church and another minister; and (2) whether the "fraud" and "collusion" exceptions to the First Amendment defense are viable claims when a minister is discharged in retaliation for reporting misconduct of another minister.

## II.

Title VII of the Civil Rights Act of 1964 addresses discrimination in the employment context. Section 703 of Title VII makes it unlawful for an employer to

> fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1) (1988). Furthermore, section 704 of Title VII prohibits an employer from retaliating against an employee who participates in proceedings pursuant to Title VII, or who opposes practices made unlawful by Title VII. 42 U.S.C. § 2000e–3(a). In interpreting Title VII, the Supreme Court has held that the prohibition against discrimination on the basis of sex encompasses sexual harassment. *Meritor Savs. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

Section 702 of Title VII exempts religious institutions from the religion provision contained in section 703. That section provides:

> This subchapter shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e–1. Although this section allows religious institutions to make employment decisions on the basis of religious preference, Title VII does not permit religious organizations to make such decisions on the basis of race, sex, color, or national origin. *Rayburn v. General Conference of Seventh-day Adventists,* 772 F.2d 1164, 1166–67 (4th

Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986).

The legislative history of section 702 clarifies that Congress intended that religious employers only be exempted from the portion of section 703 prohibiting discrimination on the basis of religion. Congress considered and rejected a provision that would have wholly excluded religious employers from the scope of Title VII in favor of the narrower exemption now contained in the statute. *McClure v. Salvation Army,* 460 F.2d 553, 558 (5th Cir.) (citing 110 Cong. Rec. 12818), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). Thus, it is clear that Congress intended to subject even religious employers to Title VII's prohibition on discrimination on the basis of race, sex, color, or national origin. *Rayburn,* 772 F.2d at 1167.

In order to state a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: (1) that she engaged in an activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment action. *Ray v. Tandem Computers, Inc.,* 63 F.3d 429 (5th Cir. 1995). Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a legitimate nonretaliatory reason for its adverse actions. *Id.* If the defendant satisfactorily discharges this burden, the burden shifts back to the plaintiff to show that the defendant's articulated reasons are pretextual, and that, "but for" her pro-

tected actions, she would not have been subject to the adverse treatment. *Id.* The burden of persuasion lies with the plaintiff at all times. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

Although it is clear that Congress intended to subject religious employers to Title VII's prohibition on discrimination on the basis of race, sex, color, or national origin, the majority holds that the Religion Clauses of the First Amendment to the United States Constitution forbid a minister from bringing such an action against her church. I disagree.

### III.

I would hold that the trial court may properly exercise jurisdiction over the petitioner's Title VII claim without offending the Religion Clauses of the First Amendment. In analyzing the issue of whether a statute or regulatory scheme may appropriately be applied against a religious institution, courts have looked either to the Establishment Clause, the Free Exercise Clause, or a combination of the two. While I believe that Free Exercise Clause analysis presents the soundest approach to this inquiry,[2] I would reach the same result under either of the Religion Clauses. I will thus present my views under both clauses, addressing the Free Exercise approach first.

### A.

The First Amendment to the United States Constitution states in pertinent part:

**2.** Although numerous jurisdictions have recognized an argument that the Establishment Clause may limit governmental regulation of religious institutions, *e.g., Rayburn,* 772 F.2d 1164; *see also National Labor Relations Bd. v. Catholic Bishop,* 440 U.S. 490, 501–02, 99 S.Ct. 1313, 1319–20, 59 L.Ed.2d 533 (stating that were the Court considering the First Amendment issue, the Court would be required to determine whether the government entanglement with religion was excessive pursuant to the *Lemon* Establishment Clause test), commentators have persuasively opined that such use of the clause faces serious obstacles. William P. Marshall & Douglas C. Blomgren, *Regulating Religious Organizations Under the Establishment Clause,* 47 Ohio St. L.J. 293, 306 (1986); Joanne C. Brant, *"Our Shield Belongs to the Lord": Religious Employers and a Constitutional Right to Discriminate,* 21

Hastings Const. L.Q. 275, 298 (1994). The first concern commonly voiced is the illogic in claiming that the government is "establishing" or supporting a religious institution by requiring that it comply with statutory or regulatory requirements. Marshall & Blomgren, *supra,* at 306. Another more substantive concern is that the application of current Establishment Clause analysis to preclude regulation of religious institutions would be unlimited in scope as the *Lemon* test does not take into account countervailing policy considerations. *Id.* at 306–07. Moreover, application of the Establishment Clause in this context runs the risk of engendering religious favoritism, because by exempting religious institutions from government regulation, courts place those entities not excluded from such regulation at a disadvantage. *Id.* at 324.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The focal point of the Free Exercise Clause of the First Amendment is the right of the individual to choose his own course with regard to religious affairs without compulsion from the state. *Abington School Dist. v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963); *Americans United for Separation of Church and State Fund, Inc. v. State*, 648 P.2d 1072, 1078 (Colo.1982).[3] However, the concept embraced by the Free Exercise Clause, freedom to act, is not absolute. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *Moses v. Diocese of Colorado*, 863 P.2d 310, 319 (Colo.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994). "Conduct remains subject to regulation for the protection of society." *Cantwell*, 310 U.S. at 303–04, 60 S.Ct. at 903; *Moses*, 863 P.2d at 319.

Along these same lines, it is well established that the Free Exercise Clause does not grant churches broad immunity from being sued in civil courts. *Moses*, 863 P.2d at 320; *Destefano v. Grabrian*, 763 P.2d 275, 284 n. 9 (Colo.1988); *cf. Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) ("[E]ven religious schools cannot claim to be virtually free from some state regulation."). We have recently stated that "[a]pplication of a secular standard to secular conduct that is tortious is not prohibited by the Constitution." *Moses*, 863 P.2d 310, 320 (citing *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). Similarly, the Supreme Court has recently opined that even religiously motivated conduct is not immune from neutral laws of general applicability. *Smith*, 494 U.S. at 885–86, 110 S.Ct. at 1603–04.

Prior to the United States Supreme Court's decision in *Smith*, the standard universally applied to determine whether a challenged governmental action was permissible under the Free Exercise Clause was that articulated by the Court in *Sherbert v. Ver-*

ner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The *Sherbert* Court held that a challenged governmental action would only withstand constitutional challenge if it

represents no infringement by the State of [the petitioner's] constitutional rights of free exercise, or because any incidental burden on the free exercise of [the petitioner's] religion may be justified by a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate."

*Id.* at 403, 83 S.Ct. at 1793. More recently, in *Smith*, the Court articulated the *Sherbert* test as follows:

Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest.

*Smith*, 494 U.S. at 883, 110 S.Ct. at 1602.

This court, in *Young Life v. Division of Employment and Training*, 650 P.2d 515 (Colo.1982), interpreted the *Sherbert* standard as follows:

[A]ctions taken in accord with religious belief may be subject to incidental burdens imposed by government.... In cases where a significant conflict between permissible goals of the state and. religious practices exist, a balancing test is used to measure whether the state has exceeded its constitutional power. In order to outweigh a substantial burden on religiously motivated activity, the state aim involved must be compelling and the state action must be the least restrictive means of achieving the goal.

*Id.* at 524.

Reading these formulations together, I would conclude that the following statements were valid in Colorado before *Smith*: (1) A challenged governmental action will be upheld under the Free Exercise Clause of the United States Constitution if the action does not burden a religious practice of an individual or religious entity; and (2) A challenged governmental action will be struck down as violative of the Free Exercise Clause of the United States Constitution if the action creates any incidental burden on a religious

---

3. The Religion Clauses of the First Amendment are applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

practice of an individual or religious entity that is not justified by a compelling governmental interest, or is not the least restrictive means for accomplishing that interest.

In *Smith*, the United States Supreme Court held that the *Sherbert* compelling interest test does not apply to generally applicable criminal laws. The Court stated that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith*, 494 U.S. at 879, 110 S.Ct. at 1600 (citing *United States v. Lee*, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1059 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment); *Minersville School Dist. v. Gobitis*, 310 U.S. 586, 595, 60 S.Ct. 1010, 1013, 84 L.Ed. 1375 (1940)).

The Supreme Court's holding in *Smith* infused considerable uncertainty into Free Exercise Clause analysis. One way it did so was by not overruling *Sherbert* but only limiting the vitality of the standard contained therein. *See Smith*, 494 U.S. at 884–85, 110 S.Ct. at 1603 (limiting *Sherbert* only by holding that it does not apply to challenges of across-the-board criminal prohibitions on particular forms of conduct). Thus, courts are now provided no clear guidance in determining whether the *Sherbert* or *Smith* standard applies in the variety of situations not addressed by the *Smith* court.[4]

In the instant case, however, I would hold that we are not faced with such a predicament. I would hold that we need not decide whether the *Smith* standard applies because the UCRS's free exercise claim in this case does not even survive the less restrictive *Sherbert* balancing test.[5] *See National Labor Relations Bd. v. Hanna Boys Ctr.*, 940 F.2d 1295, 1305 (9th Cir. 1991) (applying *Sherbert* rather than *Smith* where there was no state interference with the free exercise of

---

**4.** Many lower courts have applied the *Smith* rule in civil contexts. *E.g., People v. LaPorte Church of Christ*, 830 P.2d 1150, 1152 (Colo.App.1992); *Black v. Snyder*, 471 N.W.2d 715, 719 (Minn.App. 1991); *Health Servs. v. Temple Baptist Church*, 112 N.M. 262, 814 P.2d 130, 134–35 (App.), *cert. denied*, 112 N.M. 262, 814 P.2d 130 (1991).

**5.** Although I would hold that we need not decide whether *Smith* applies here, I write further to express my disagreement with the majority's analysis of *Smith*. The majority holds that *Smith* is inapplicable to the instant facts, and that even if *Smith* applied, it would support the majority's holding precluding application of Title VII in the present case. Maj. op. at 1130. The majority notes that the underlying justification for the *Smith* holding is that it is not within the province of the judiciary to evaluate or pass judgment on an individual's religious beliefs. *Id.* at 1130. The majority then goes on to state that

> [a]pplying Title VII or any anti-discrimination law to a church's choice of a minister would require a judge to question the belief system of the church, to validate certain interpretations of the religious doctrine over others, or to compel the church to accept certain ideas into their belief system. . . . It would be impossible for a court to apply Title VII and evaluate the propriety of a minister hiring or discharge decision without evaluating the beliefs behind that decision.

Maj. op. at ——.

The majority misconstrues *Smith* and misunderstands how it would apply to this case. When the *Smith* Court stated its disapproval of judicia-

ry evaluation of individual religious beliefs, it was in the context of abandoning the *Sherbert* compelling interest test championed and applied by the majority. *Smith*, 494 U.S. at 885–88, 110 S.Ct. at 1603–05. The *Smith* court expressly stated its dissatisfaction with the compelling interest standard because that standard requires courts to

> question the centrality of particular beliefs or practices to a faith, [as well as] the validity of particular litigants' interpretations of those creeds.

*Id.* at 887, 110 S.Ct. at 1604.

It is the compelling interest test, applied by the majority, that requires the judiciary to inquire into and question religious beliefs. The *Smith* standard, on the other hand, is a bright line rule that avoids such inquiry. The compelling interest test, applied in the context of a Title VII action brought by a minister against her church, requires the judiciary to evaluate the significance and centrality of that ministerial position in deciding whether or not to grant the church an exemption from Title VII under the Free Exercise Clause. *See Rayburn*, 772 F.2d at 1169 ("[I]t is our duty to determine whether the position of associate in pastoral care is important to the spiritual mission of the [Church]."). This is precisely the type of inquiry the *Smith* Court found abhorrent.

Conversely, the *Smith* approach avoids such inquiry, whether in the context of a criminal prohibition or a Title VII action brought by a minister against her church. The *Smith* approach merely requires a court to inquire whether the regulation in question is a "neutral law of

religious beliefs), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). The petitioner in this case does not challenge the religious beliefs or ecclesiastical doctrine of the UCRS, but only asserts that the UCRS violated the secular mandate of Title VII prohibiting retaliation against individuals for activities protected under that statute. The petitioner further maintains that any assertion on the UCRS's part that the decision to fire the petitioner was religiously motivated is a pretext for such retaliation. I would hold that the trial court's exercise of jurisdiction over the petitioner's claim—in order to determine whether any religious motivation asserted by the UCRS for retaliating against the petitioner was, in fact, the genuine reason for her termination—would not burden any religious practice of the respondents.

### 1. Pretext

Several courts which have applied the above principles have held that it is appropriate to inquire into whether a defendant's asserted legitimate reasons for its discriminatory actions are pretextual. In *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), the United States Supreme Court held that a state civil rights commission did not violate the Religion Clauses of the Constitution by investigating the circumstances of a religious school teacher's discharge. In *Dayton,* the plaintiff was employed as a teacher at Dayton Christian Schools (Dayton). After the plaintiff informed her superior at Dayton that she was pregnant, her superior notified her that her contract would not be renewed at the end of the school year because Dayton's religious

doctrine required that mothers stay home with their preschool age children.

The plaintiff then contacted an attorney, who sent a letter to Dayton's superintendent threatening litigation if Dayton did not agree to renew the plaintiff's employment contract. Upon receiving the letter, the superintendent suspended the plaintiff, and Dayton's board subsequently terminated her. The board stated that the sole reason for the plaintiff's termination was her violation of a church doctrine that one Christian should not take another Christian into courts of the state.

The plaintiff then filed a complaint with the state civil rights commission alleging that Dayton's nonrenewal of her contract constituted sex discrimination in violation of state law, and that her termination constituted impermissible retaliation in violation of state law. The commission found that there was probable cause to believe that Dayton had discriminated and retaliated in violation of state law, and subsequently initiated administrative proceedings against Dayton.

While the administrative proceedings were pending, Dayton filed an action in the federal district court seeking an injunction against the state administrative proceedings on the ground that such proceedings violated the Religion Clauses of the First Amendment. The district court refused to issue the injunction, and the United States Court of Appeals for the Sixth Circuit reversed, holding that the exercise of such jurisdiction by the state agency would violate both the Free Exercise Clause and the Establishment Clause of the First Amendment.

The United States Supreme Court reversed. Although the Court based its hold-

general applicability," and if so, to apply the regulation uniformly. *Smith,* 494 U.S. at 879–80, 110 S.Ct. at 1600–01. The majority fears that the application of Title VII to the propriety of a minister discharge decision would require the court to evaluate the beliefs behind that decision. The majority's fears are unwarranted, because the beliefs behind the decision would be irrelevant under *Smith.* So long as Title VII passed muster under the *Smith* standard, as a neutral law of general applicability, the Free Exercise Clause would be unavailable to the church as a defense. *Id.* Thus, no inquiry into the importance or centrality of the church's belief system would be necessary.

The judicial inquiry into religious beliefs prohibited by the *Smith* Court occurs during the decision whether to grant a Free Exercise Clause exemption to the religious institution, not during the action under the regulation itself. *Id.* at 882–83, 110 S.Ct. at 1601–02. Thus, in a case such as the one before us, the only required inquiry would be whether Title VII is a neutral law of general applicability. If it is not, then it may be stricken. If Title VII is a neutral law of general applicability, however, it should be applied in a uniform fashion, as it would be to any nonreligious actor.

ing on abstention grounds, the Court took the opportunity to expound on the substance of the constitutional claim as follows:

> Even religious schools cannot claim to be wholly free from some state regulation. We therefore think that however Dayton's constitutional claim should be decided on the merits, the Commission violates no constitutional rights by merely investigating the circumstances in this case, *if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge.*

*Id.* at 628, 106 S.Ct. at 2723 (citations omitted) (emphasis added). The Supreme Court thus specifically stated that a pretext inquiry does not run afoul of the Religion Clauses of the First Amendment.

In another case involving a pretext inquiry, *Geary v. Visitation of the Blessed Virgin Mary,* 7 F.3d 324 (3d Cir.1993), the United States Court of Appeals for the Third Circuit held that a plaintiff could bring a claim against a religious school under the Age Discrimination in Employment Act (ADEA).[6] In *Geary,* the plaintiff was terminated from her employment as a teacher at the Blessed Virgin Mary Parish School (the School) after she turned fifty and after her twenty-ninth year of employment there. She had previously received favorable reviews, and had the defendant not terminated her, she would have been the highest paid teacher at the School. The School subsequently hired a younger, lower paid teacher to replace her.

To justify the plaintiff's dismissal, the School asserted that the plaintiff had married a divorced man in violation of Church doctrine. The plaintiff conceded that she acted in violation of church doctrine, but she argued that this reason for her termination was pretextual, and that the actual reason for her termination was her age and salary.

The plaintiff then filed a claim with the Equal Employment Opportunity Commission (EEOC), alleging that the School violated the ADEA by firing her. Subsequently, the School canceled the plaintiff's health coverage, indicating that the cancellation was required by the plaintiff's legal action. The EEOC found that, while the plaintiff's dismissal did not violate the ADEA, the retaliatory cancellation did. The plaintiff then filed an ADEA claim in the United States District Court for the Eastern District of Pennsylvania, which held broadly that the ADEA does not apply to religious schools and granted summary judgment in favor of the School.

The plaintiff then appealed to the Court of Appeals for the Third Circuit. The Court of Appeals first stated that the appropriate inquiry in this case was under the three-part standard articulated by the United States Supreme Court in *National Labor Relations Board v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). The *Geary* court stated that standard as follows:

> First, a threshold question: would application of the statute present a significant risk of infringing the First Amendment? Second, the interpretive rule: is there a permissible construction of the statute that avoids that risk, or alternatively, is there a clear expression that Congress intended that the statute apply? And, third: if the statute applies, does it violate the religion clauses of the First Amendment?

*Geary,* 7 F.3d at 327.

Applying the threshold question, the Court of Appeals held that the application of the ADEA to the plaintiff in this case did not present a significant risk of infringing the First Amendment. In so holding, the court first noted that the "simple prohibitions" of the ADEA do not present a significant threat of entanglement between church and state.[7] The court then stated that the absence of a direct conflict between the secular prohibi-

---

**6.** As the ADEA's substantive provisions were derived verbatim from Title VII, cases involving the ADEA are equally apposite here. *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978).

**7.** Although the *Geary* court utilized the Establishment Clause "entanglement" mode of analysis, *Geary* is equally apposite under Free Exercise analysis because of its general determination that, under the *Catholic Bishop* test, an inquiry into whether a religious institution's asserted reasons for its discriminatory actions are pretextual does not present a significant risk of infringing First Amendment interests.

tions of the ADEA and the asserted religious doctrine militated toward a finding that there was no risk of infringement of the First Amendment.

The court next addressed the fact that the case involved a "pretext" argument. The court stated that as long as a plaintiff only challenges whether the asserted nondiscriminatory reason actually motivated the challenged action, and does not challenge the validity of the religious doctrine itself, no significant risk of offending the First Amendment is presented. *Id.* at 329. The court then noted that the process of inquiry could permissibly proceed as follows:

> The secular tribunal merely asks whether a sincerely held religious belief actually motivated the institution's actions. The institution, at most, is called upon to explain the application of its own doctrines. Such an application is no more onerous than is the initial burden of any institution in any First Amendment litigation to advance and explain a sincerely held religious belief as the basis for a defense or claim. Indeed, because the court in an ADEA case should not examine either the validity or the religious nature of the doctrine, the burden of the religious institution to explain is considerably lighter than in a nonreligious employer case.
>
> *Thus, when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious visions, that inquiry does not present a significant risk of entanglement.* However, the First Amendment dictates that a plaintiff may not challenge the validity, existence or "plausibility" of a proffered religious doctrine, and we caution that the ADEA would not apply in such a case.

*Id.* at 330 (citations omitted) (emphasis added). The Court of Appeals went on to dismiss the plaintiff's claim because she did not refute the School's proffered legitimate reason for her dismissal. Significantly, the court also held that the plaintiff's retaliation claim could stand because it did not present any First Amendment issues. *Id.* at 332; *see also DeMarco v. Holy Cross High Sch.,* 4 F.3d 166 (2d Cir.1993).

The reasoning in *Dayton* and *Geary* is apt, and I would apply the same analysis to the pretext inquiry in the instant case. A pragmatic examination of the procedural aspects of a Title VII case reveals that a trial forum could adjudicate the instant dispute without trespassing into the protected realm of ecclesiastical doctrine. Under the tripartite Title VII burden-shifting mechanism, the trial could proceed as follows: (1) The petitioner would be required to make out a prima facie case that the UCRS terminated her and revoked her novitiate license as retaliation for the petitioner's protected actions under Title VII; (2) the burden would then shift to the UCRS to articulate a legitimate non-discriminatory reason for the actions taken against the UCRS; in this case the UCRS could also articulate a legitimate ecclesiastical reason for such actions that would be protected under the First Amendment; (3) once the UCRS articulated such a reason, the burden would then shift back to the petitioner to show that the UCRS's articulated reason is actually a pretext for the unlawful retaliation alleged by the petitioner in her prima facie case.

At no time during the burden-shifting process would the trier of fact be required to question the belief system of the UCRS, nor to validate any interpretation of religious doctrine in favor of another, nor to compel the UCRS to accept any idea into its belief system. The trier of fact would weigh the evidence and conclude that one side or the other possesses more credibility. The trier of fact would not be required to evaluate church doctrine. The trier of fact would merely weigh whether it accepts the petitioner's version of events, that the UCRS illegally retaliated against her and that any assertion of a legitimate motivation on the UCRS's part is pretext, or the UCRS's version, that the UCRS's actions were ecclesiastically motivated.

There are thus only two possibilities: If the trier of fact believes the petitioner, this would mean that the UCRS's actions were secular activities prohibited by Title VII and therefore outside the purview of the First Amendment. Alternatively, if the trier of fact believes the UCRS, this would mean that

the UCRS's activities were ecclesiastically motivated, within the protection of the First Amendment, and the UCRS would prevail. This method of analysis simply does not present the possibility of the evaluation of church doctrine.

It is true that the sacred protections of the Religion Clauses exempt religious institutions from liability for ecclesiastical decisions that would otherwise run afoul of civil law. It is also true, however, that the Free Exercise Clause does not grant religious institutions broad immunity from being sued in civil courts. *Moses*, 863 P.2d at 320; *Destefano v. Grabrian*, 763 P.2d 275, 284 n. 9 (Colo.1988); see *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986). It would be contrary to our precedent, therefore, to hold that on the one hand the church is prohibited from engaging in certain secular conduct, but that on the other hand, the First Amendment precludes secular tribunals from inquiring into that very conduct. Such a holding would allow religious institutions to engage in unlawful discrimination, exempted by neither the First Amendment nor Title VII, with impunity. I would thus hold that the Free Exercise Clause does not prohibit the State of Colorado from inquiring into the secular wrongs of the church.

### 2. "Minister Exception"

The majority bases its holding on the proposition that, because the petitioner is a minister, she is absolutely precluded from bringing an action against the UCRS for terminating her employment and revoking her novitiate license in violation of Title VII. By so holding, the majority pens the first decision by a court of this state carving an exception into our well established rule that

the Free Exercise Clause does not grant churches broad immunity from being sued in civil courts. Such an exception has heretofore never been recognized by a Colorado court, and I would decline to incorporate such an exception into our jurisprudence.[8]

The majority cites *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164 (4th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986), as a leading case supporting its holding that the trial court in this case lacked jurisdiction to adjudicate the petitioner's Title VII claim. Maj. op. at 1127. *Rayburn*, however, is inapposite to the instant facts because the *Rayburn* court did not face the situation, as we do here, where a clergy member challenges a religious institution's religious justification for its actions as being a pretext for prohibited secular conduct.

In *Rayburn*, the petitioner was denied a position on the pastoral staff of the respondent church. The petitioner then brought an action against the church's governing body, alleging discrimination on the basis of race and sex in violation of Title VII. The United States Court of Appeals for the Fourth Circuit affirmed the district court's grant of summary judgment in favor of the church. The Court of Appeals held that such ecclesiastical decisions are inviolate and that " 'civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.' " *Rayburn*, 772 F.2d at 1167 (citing *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976)).[9] The Court of Appeals went on to clarify, however, that

**8.** The majority cites numerous cases from jurisdictions outside of this state for the proposition that a minister may not bring a Title VII action against her church. Maj. op. at 1126–1128. These decisions are not binding on this court. Colorado law is clear and unequivocal that the Religion Clauses of the First Amendment do not grant churches broad immunity against being sued in civil courts. *Moses*, 863 P.2d at 320.

**9.** The majority cites *Milivojevich* for the proposition that a church is exempted by the First

Amendment from actions involving the hiring or termination of a minister. Maj. op. at 1131. *Milivojevich* is inapplicable to the case in front of us. That case held that the First Amendment precluded civil courts from adjudicating disputes involving the church's own internal laws and procedures. *Milivojevich*, 426 U.S. 696, 708, 96 S.Ct. 2372, 2380 (1976). This principle is inapposite to the present case where the church seeks to preclude review of its alleged violations of federal discrimination law.

churches are not—and should not be—above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts. Their employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions.

*Id.* at 1171.

*Rayburn* is thus inapplicable to the case before us because the petitioner here does not challenge the church's spiritual functions. The petitioner in this case only argues that any religious motivation asserted by the UCRS is a pretext for unlawful secular actions.

Another federal jurisdiction has held that, under certain circumstances, a religious organization may be haled into court for a personnel decision regarding a minister. In *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468 (8th Cir.1993), the United States Court of Appeals for the Eighth Circuit held that the First Amendment did not require the dismissal of a *minister's* tort claims against his church. In so holding, the court stated that "[t]he First Amendment does not shield employment decisions made by religious organizations from civil court review ... *where the employment decisions do not implicate religious beliefs, procedures, or law.*" *Id.* at 471. The court further held:

> At [the motion to dismiss] stage of this litigation we are unable to predict that the evidence offered at trial will definitely involve the district court in an impermissible inquiry into the Synod's bylaws or religious beliefs.... The Synod has not offered any religious explanation for its actions which might entangle the court in a religious controversy in violation of the First Amendment.

*Id.* at 472.

The court went on to elaborate how such a dispute between a minister and his church could be appropriately adjudicated without offending the First Amendment:

> On remand, the district court must exercise care to ensure that the evidence presented at trial is of a secular nature....

It is incumbent on the court to limit the evidence at trial in order to avoid determining religious controversies.

*Id.;* see also *Minker v. Baltimore Annual Conference*, 894 F.2d 1354, 1360 (D.C.Cir. 1990) (allowing minister to bring action against church and stating that "appellant should be allowed to demonstrate that he can prove his case without resorting to impermissible avenues of discovery or remedies," and that "[m]aintaining a suit, by itself, will not necessarily create an excessive entanglement").

If we are to look outside of our own jurisdiction for a standard to apply, I would hold that *Drevlow* is far more applicable to the instant case than is *Rayburn* and its progeny. *Drevlow*, as does the instant case, involved a personnel decision regarding a minister where it was not apparent at the motion to dismiss stage of the case that any impermissible inquiries into the church's religious doctrine would be made. Moreover, *Drevlow* very succinctly explains how such entanglements can be avoided from a pragmatic standpoint. I see no reason why the trial forums in our jurisdiction would not be competent to avoid such a conflict. I would thus decline to adopt a "minister choice" exception to our well established rule that the Free Exercise Clause does not grant churches broad immunity from being sued in civil courts. I turn now to my analysis of this issue under the Establishment Clause of the First Amendment to the United States Constitution.

### B.

The function of the Establishment Clause of the First Amendment is to withdraw matters of religious worship and belief from governmental "sponsorship, financial support, and active involvement." *Americans United for Separation of Church and State Fund, Inc. v. State*, 648 P.2d 1072, 1078 (Colo.1982) (citing *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). Thus, the command of the Establishment Clause is to prohibit the State from endorsing a particular religion. *Allegheny County v. American Civil Liberties Union*, 492 U.S. 573, 605, 109 S.Ct. 3086, 3107, 106

L.Ed.2d 472 (1989); *State v. Freedom From Religion Found.*, 898 P.2d 1013, 1019 (Colo. 1995). The Supreme Court has formulated, and we have endorsed, a tripartite test to determine whether a statutory scheme improperly endorses religion in violation of the Establishment Clause: (1) The statute must have a secular legislative purpose; (2) the primary effect of the statute must be one that neither advances nor inhibits religion; and (3) the statute must not foster an excessive governmental entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Americans United*, 648 P.2d at 1078.

In the context of governmental regulation, some courts have utilized the Establishment Clause to determine the constitutionality of a statute or regulatory scheme under the First Amendment. *See, e.g., Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 361 (8th Cir.1991); *Rayburn*, 772 F.2d at 1169. In determining the constitutionality of a statute or regulation, most courts focus on the entanglement prong of the *Lemon* test, asking whether imposition of the statute on the particular religious institution will foster excessive entanglement between the government and the religious institution. *Scharon*, 929 F.2d at 361; *Rayburn*, 772 F.2d at 1169.

In the context of a Title VII action brought by a minister against his church in which the minister alleges that the church's asserted religious reasons for its actions are pretextual, courts have held that entanglement concerns are not implicated. *Geary*, 7 F.3d at 329; *DeMarco v. Holy Cross High School*, 4 F.3d 166, 172. In *Geary*, the court stated that in a situation where a religious institution argues that a permissible religion-based discrimination formed the true motive for the challenged action, entanglement concerns will not be raised so long as the plaintiff does not challenge *the validity of the religious doctrine itself.* The court went on to conclude:

> Thus, when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious vi-

sions, that inquiry does not present a significant risk of entanglement.

*Geary*, 7 F.3d at 330.

The reasoning in *Geary* is persuasive and compels the same conclusion in the case at bar. The limited inquiry in this case is whether the UCRS discharged the petitioner in retaliation for her protected actions under Title VII. If the UCRS is required to defend these actions, it has the option of admitting that it took unlawful retaliatory action, or denying that its actions constituted illegal retaliation and articulating legitimate reasons for its actions. In the former situation, UCRS faces liability unless it persuades the court that it is entitled to a religious exemption under the First Amendment. Under the latter scenario, the only issue is whether the UCRS's asserted reasons for the retaliation are pretextual, not whether they are doctrinally correct. Because the court is not required to determine whether UCRS's asserted reasons are doctrinally correct, nor even to evaluate them at all, there is no risk of impermissible entanglement between church and state. I would thus hold that the exercise of jurisdiction over the petitioner's Title VII claim against the UCRS would not violate the Establishment Clause of the First Amendment.

### IV.

As neither the Free Exercise Clause nor the Establishment Clause precludes the trial court from exercising jurisdiction over the petitioner's Title VII claims against the UCRS, I respectfully dissent.