**BEAR VALLEY CHURCH OF CHRIST, a Colorado corporation, Petitioner/Cross–Respondent,**

**v.**

**Denise DeBOSE, and J.D.B., a minor child, by and through his parent and next friend, Denise DeBose, Respondents/Cross–Petitioners,**

**and**

**Homer Wolfe, Respondent/Cross–Petitioner.**

**No. 95SC42.**

Supreme Court of Colorado,
En Banc.

Dec. 23, 1996.

Rehearing Denied Jan. 13, 1997.

---

Quigley & Bruce, Neil Quigley, Denver, for Petitioner/Cross–Respondent.

Holland, Seelen & Pagliuca, Joyce Seelen, Jeffrey S. Pagliuca, Denver, for Respondents/Cross–Petitioners Denise DeBose, and J.D.B., a minor child.

Hibschweiler & Johnson, James D. Johnson, Sheila E. Barthel, Denver, for Respondent/Cross–Petitioner Homer Wolfe.

Justice LOHR delivered the Opinion of the Court.

This case presents constitutional, evidentiary, and jury instruction issues arising from the trial of tort claims brought against a religious institution and one of its former pastors. The plaintiffs, a mother and her son, filed suit against their former church and the pastor, alleging a variety of tortious offenses stemming from the pastor's conduct during counseling sessions with the son. The trial court allowed a jury to consider the claims, and the jury returned several verdicts for the plaintiffs. In a divided opinion, the Colorado Court of Appeals reversed the judgment entered on the verdicts and remanded the case for a new trial. *DeBose v. Bear Valley Church of Christ*, 890 P.2d 214, 218, 231 (Colo.App.1994). We granted certiorari and now reverse the judgment of the court of appeals and remand with directions to reinstate the trial court's judgment.

## I.

Several families organized and incorporated the Bear Valley Church of Christ (Bear Valley) in 1962. Bear Valley is an autonomous church, administered by a panel of elders whose responsibilities are to oversee and shepherd the activities and fellowship of the Bear Valley congregation. In 1981, Bear Valley hired Homer Wolfe to head a new Family Life Ministry and to engage in counseling efforts. Wolfe and the Family Life Ministry operated under the direct supervision and authority of the Bear Valley elders.

In 1981, the same year that the elders hired Wolfe, Denise DeBose joined the Bear Valley congregation. DeBose sought counseling with Wolfe in 1984 to discuss her marital problems. She found Wolfe's counseling to be satisfactory, but for other reasons changed counselors. DeBose brought her son (DeBose child, or child)[1] to Wolfe for counseling once in 1984, and then, as DeBose testified, "on a consistent basis, but sporadically throughout the year" from the fall of 1985 until Bear Valley terminated Wolfe's employment in June of 1988. The impetus for the counseling was Wolfe's request to see

---

1. The DeBose child was born on October 25, 1974. He therefore was about eleven years old when he began counseling sessions with Wolfe.

the child in counseling and DeBose's concern that her child's poor scholastic performance reflected the turmoil of her marriage. During her child's first counseling session with Wolfe, DeBose observed through a window to Wolfe's office that her child was crying and that Wolfe was holding and comforting the child.

According to the child, Wolfe engaged in a pattern of inappropriate touching during the child's counseling sessions. The child testified that in the first couple of counseling sessions with Wolfe, "he would sit me on his lap and rub my back and my leg."[2] The child explained that sometime before the fall of 1987, Wolfe "slid [my] shirt up," and "rubbed me up underneath my shorts, by my penis and on my back," that Wolfe "would rub my leg up to my side and just touch my penis," and that Wolfe touched his "privates." The child testified that Wolfe rubbed the child's thigh "[a] lot." The child also related that during the massaging, Wolfe told him "that my mom would love me, my dad would love me, and that Jesus loved me, and [Wolfe] would love me." The child also testified that there were no counseling sessions where Wolfe did not "rub" him.[3]

Wolfe, however, testified that he never massaged or touched the child inappropriately in any way. Wolfe admitted that he examined genitalia and used massage and disrobing techniques on other counselees, but insisted that he always stopped massaging "[j]ust above the knee," because "any good thing can be carried too far, even." Wolfe maintained throughout the trial that in his counseling activities he never actually touched any client's genitals.

In May of 1987, Gary Don Wygal, Sr., met with Wolfe, an elder named "Sandy" Sanderson, and a Bear Valley instructor named Dick Brant, to complain about the methods Wolfe was employing in counseling the Wygals' fourteen-year-old son. Wygal's specific complaints included the allegation that Wolfe asked to examine the youth to see if he had been properly circumcised. In contrast, Sanderson testified that Mr. Wygal never presented a definitive complaint in May of 1987 and that the Wygals' fears were a "smoke cloud" for "what [their son] was interpreting that happened."[4] Another elder, Jerry Taylor, testified that Sanderson approached him and other elders in July of 1987 with the Wygals' complaint, and that the elders understood that there were accusations of "some touching and some massaging."

The initial meeting in May of 1987 resulted in a meeting in June or July of 1987, where Wygal and his wife, Mary Wygal, met with Wolfe and the Bear Valley elders. The Wygals testified that the June or July of 1987 meeting served as a forum for the Wygals to express their concerns about Wolfe's counseling methods with their son, including Wolfe's questions regarding circumcision.[5] Mrs. Wygal testified that Wolfe explained at the June or July of 1987 meeting that there must be a "misunderstanding" because "he was just going to take [the Wygals' child] to a book and show him what his private parts would look like if he was properly circumcised."

Mr. Wygal testified that the elders asked the Wygals in the June or July of 1987 meeting to allow the elders to investigate the

---

**2.** The DeBose child later amended his statement, however, by testifying that the back massages did not begin until the third or fourth counseling session with Wolfe.

**3.** The child's memory regarding these events improved between the time of the child's deposition and the time of the child's testimony, after the child met with several therapists.

**4.** Sanderson so testified despite admitting that he was aware of Mrs. Wygal's express concern that her son might be the victim of sexual molestation.

**5.** The record reflects that the Wygals also brought the complaints of either one or two other children to the attention of the elders during the meeting in June or July of 1987. Mrs. Wygal testified that her son appeared at the meeting to confront Wolfe with the claims of a friend who asserted that Wolfe asked "to examine him" and "rubbed his back or stroked his back." Mr. Wygal testified that he told Wolfe and the elders that a young male counselee had complained to one of the Wygals' children that "Homer [Wolfe] was rubbing on him all the time." The record is unclear whether the same child made both complaints.

situation, "[a]nd they assured us that they would take care of it." The elders had already spoken to Wolfe in April of 1986 about the need to focus on "biblical" counseling, as opposed to "professional and medical" counseling. Although Sanderson thought that the Wygals' concerns were a "family issue" and expressed that view to the other elders, Wolfe agreed in testimony that the elders instructed him on August 13, 1987, that "they wanted it clearly to be pastoral counseling and not anything in the clinical area." [6]

Still, the elders allowed Wolfe to continue counseling those persons who were, in Wolfe's words, "sensitive" or in need of "emotional stability," including the DeBose child. Wolfe asked permission from the elders to continue his counseling in this limited fashion, and remained "open about the amount of counseling that he was doing." Wolfe testified that the elders never asked him about his counseling techniques, even after the Wygals complained, and that he would have been forthright with the elders about his methods if they had.

The Wygals were not satisfied when the elders concluded after the meeting in June or July of 1987 that the Wygals' complaint was simply the product of a "misunderstanding." The Wygals were also concerned that they had never heard back from the elders regarding any resolution of the complaints voiced at the meeting in June or July of 1987. As a result, Mr. Wygal shared his concerns with his teacher at the Bear Valley School of Preaching, Jack Carter, who testified that he in turn spoke with the elders about the Wygals' complaints. Mr. Carter agreed in testimony that the elders responded that they had already placed restrictions on Wolfe "in the areas of sexual activity or sexual counseling."

The Wygals remained dissatisfied with the elders' handling of their complaints. Approximately nine months after the first meeting in June or July of 1987, the Wygals met with the elders and Wolfe again in March of 1988, and discussed, according to one of the elders, "the matter of touching," "[Wolfe's] manner of hugging the [Wygal] boy," and "massaging on the [Wygal boy's] back." Mr. Wygal testified that Wolfe explained to the elders during the March 1988 meeting that it was necessary to examine the genitals of the Wygals' son because if the boy was not properly circumcised, it could cause the boy to be "easily excited sexually." However, the elders again concluded after the March meeting that the Wygals' complaints were the product of a "misunderstanding." [7]

Nevertheless, on March 23, 1988, the elders directed Wolfe to cease his counseling

---

6. The minutes from the elders' August 13, 1987, meeting also include a notation that the "[e]lders postponed the class taught by [Wolfe] to a later date as a result of the recent Wygal situation."

7. Sanderson's testimony regarding the various meetings differed in some respects from the other testimony presented at trial. Sanderson testified that he met first with Brant and *both* Mr. *and* Mrs. Wygal. According to Sanderson, Brant approached Sanderson after this first meeting and informed him that there "needs to be something done that would find out what was going on with Homer Wolfe." Sanderson testified that he brought the issue to the elders' attention at the elders' next meeting. Sanderson testified that the elders then scheduled a time to speak with Wolfe, and told Wolfe that they "did not want him to be involved in clinical counseling in any way." After meeting with Wolfe, Sanderson testified, "[i]t was simply left that Homer was to follow the elders wishes and get himself in—if there was anything that was an issue or a problem with him—to get it straightened out and to do what we wanted him to do." Sanderson explained that either Brant or Mr. Wygal then requested another meeting, and that a meeting subsequently occurred between Sanderson and Mr. Wygal. Sanderson did not mention whether Brant was present at this meeting and could not remember whether Wolfe was present. Sanderson was unsure as to whether Mrs. Wygal was present at his second meeting with Mr. Wygal. Sanderson then described a meeting between Mr. Wygal and the elders, but could not remember if Mrs. Wygal was present. However, Sanderson affirmatively testified that neither Wolfe nor the Wygals' son was present at the first meeting between Mr. Wygal and the elders. The elders then scheduled a second meeting with Wolfe, and that meeting ended when "Homer was reprimanded rather severely and instructed to not continue in any form of the activities that he had been in; there were to be *no* visits with anyone for the purpose of giving them any form of counseling." (Emphasis in testimony.) Sanderson did not describe any other meetings addressing the Wygals' concerns with Wolfe's counseling methods.

efforts "for the time being effective immediately," because of the Wygals' complaints and the complaints of the parents of another young male counselee, who claimed that Wolfe was "rubbing and massaging" their child inappropriately, and that "his genitals had been handled." The elders terminated Wolfe's employment in early June of 1988, ostensibly due to the ineffectiveness of the Family Life Ministry and not primarily due to any allegations raised by Wolfe's counselees, because, as one elder testified, "those were allegations, and we had no concrete proof that they took place and that any type of abuse—poor judgment, yes, but any type of abuse had taken place that we could identify."

In a letter to the elders on June 4, 1988, Wolfe requested an extra month of compensation to support his job hunting efforts since he would be busy "keeping counseling appointments" during his last week on the job. The DeBose child could not remember seeing Wolfe in counseling in 1987 or 1988 specifically. However, Wolfe's own calendar shows counseling appointments with the child in January, February, March, April, and May of 1988.

DeBose and her child filed suit against Wolfe and Bear Valley in Denver District Court in 1991. After trial, a jury returned a verdict for DeBose and against Bear Valley for breach of fiduciary duty and vicarious liability. The jury returned a verdict for DeBose's child and against Bear Valley for breach of fiduciary duty, outrageous conduct, negligent hiring and supervision, and vicarious liability. The jury returned a verdict for

DeBose and against Wolfe for breach of fiduciary duty. Finally, the jury returned a verdict for DeBose's child and against Wolfe for breach of fiduciary duty and outrageous conduct. On November 10, 1992, the trial court entered an amended judgment in favor of the DeBoses, including compensatory damages, exemplary damages, and interest.[8]

On appeal, the Colorado Court of Appeals, with one of the three panel members specially concurring and one dissenting, reversed the judgment and remanded the case for a new trial. *DeBose v. Bear Valley Church of Christ*, 890 P.2d 214, 218, 231 (Colo.App. 1994). The court of appeals held that (1) Wolfe was entitled to a jury instruction reflecting his theory that his counseling activities were protected by the First Amendment, *id.* at 221–222, (2) the trial court erred in permitting expert witnesses to testify regarding a professional standard for pastoral counseling, *id.* at 224–28, and (3) the jury awards were either inconsistent or duplicative, *id.* at 222–24. We then granted certiorari to review the case.[9]

## II.  *First Amendment Issues*

### A.  *First Amendment Defense of Homer Wolfe*

#### 1.

In *Destefano v. Grabrian*, we held that when a defendant raises the Free Exercise Clause of the First Amendment as a defense, "the threshold question is whether the conduct of the defendant is religious." 763 P.2d 275, 283 (Colo.1988) (citing *Wiscon-*

---

8. The judgment, as amended, awarded Denise DeBose $11,487.73 against Wolfe and $30,502.39 against Bear Valley. Wolfe was jointly and severally liable for $9,168.73 of DeBose's award against Bear Valley. The DeBose child was awarded $157,835.76 against Wolfe and $458,-098.07 against Bear Valley. Wolfe was jointly and severally liable for $75,516.68 of the DeBose child's award against Bear Valley.

9. We granted certiorari on the following issues, as reframed by the court:
   1. Whether the First Amendment provides a defense to tort claims if the alleged tortious

conduct is motivated by a sincerely held religious belief.
   2. Whether the court of appeals erred in holding that expert testimony regarding conduct appropriate in counseling a minor was admitted in error.
   3. Whether the court of appeals departed from accepted precedent in reversing verdicts where the defendants did not object to the instructions or verdict forms at trial and on appeal.
   4. Whether the court of appeals erred in reversing the jury verdicts based on their form.

*sin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972); Note, *Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct be "Free Exercise"?,* 84 Mich.L.Rev. 1269, 1302 (1986)). *Destefano* involved a Catholic priest who engaged in an adulterous relationship with a woman to whom the priest was providing marital counseling. 763 P.2d at 279. The woman and her husband asserted tort claims against the priest and his diocese. *Id.* at 277–79. We recognized that the Catholic Church requires its priests to take a vow of celibacy, a principle the defendants acknowledged in their brief by agreeing that "sexual activity by a priest is fundamentally antithetical to Catholic doctrine." *Id.* at 284. Noting that the defendants did not claim that the priest was motivated by a sincerely held religious belief to engage in an adulterous relationship with his counselee, we concluded that "[w]hen the alleged wrongdoing of a cleric clearly falls outside the beliefs and doctrine of his religion, he cannot avail himself of the protection afforded by the first amendment." *Id.* We foresaw, however, that "[i]f the alleged conduct of Grabrian was dictated by his sincerely held religious beliefs or was consistent with the practice of his religion, we would have to resolve a difficult first amendment issue." *Id.*

In *Destefano,* we reversed the summary judgment against the plaintiff on her breach of fiduciary duty claim after determining that neither the priest nor the diocese had argued that the priest's adulterous relationship with the counselee plaintiff was motivated by a sincerely held religious belief. *Id.* at 284. Similarly, we must determine as a threshold matter whether Wolfe or Bear Valley asserted a sincere religious basis for Wolfe's use of therapeutic massage with counselees.

### 2.

The court of appeals concluded that Wolfe summarized his massaging of counselees as "a technique based upon his desire to facilitate communication with God." *DeBose,* 890 P.2d at 221. "Given this testimony," the court determined that the trial court should have provided the jury with the following instruction:

> [T]he jurors should be instructed [on retrial] that, if Wolfe touched the minor only in the manner in which he described touching other counselees, that such touching was engaged in solely in a sincere effort to facilitate the minor's communication with God, and that Wolfe was not motivated by any personal desires, then the jury must conclude that Wolfe did not violate any fiduciary duty owed to the minor or to his mother nor did he engage in any outrageous conduct toward either of them.

*Id.* at 221–22. The court reached this holding even though the instruction Wolfe tendered at trial simply relied upon the First Amendment as a "complete defense." *Id.* at 222. The court held that the offer of the instruction "was sufficient to require the trial court to fashion a proper instruction on the subject." *Id.* (citing *Lee v. Great Empire Broadcasting, Inc.,* 794 P.2d 1032 (Colo.App. 1989)). We disagree that the trial court erred in failing to instruct the jury in the manner prescribed by the court of appeals.

Based on our review of the testimony and other evidence presented at trial, we agree with the dissent to the court of appeals' opinion that "Wolfe posited no religious basis for his massage technique." *Id.* at 236 (Davidson, J., dissenting).[10] Wolfe testified as to why he used massage techniques on counselees. He began by generally addressing "the subject of touching among human beings:"

> I believe that it is one of the best ways to communicate—of communicating your care and concern for the other person. We have been created in the image of God. God is love, and we are made in his image. Man can't function happily, none of us can, if we do not feel loved. It's one thing to

---

**10.** We reject Wolfe's assertion that our grant of certiorari accepted as true that Wolfe had a sincere religious basis for the use of massage techniques with young counselees.

tell somebody—say, I love you; it's entirely another thing to have it demonstrated in some way, and touching has always been some way of saying, I care about you, you're important, you're somebody, you have value, and that's something everybody needs.

Wolfe explained that the purpose of massaging a counselee "is to increase the value and the ability to communicate, both to hear and to share." Under questioning from his own counsel, Wolfe then explained why he began to massage counselees:

Q. Did you sometimes—well, I think I already established you sometimes did use massage in connection with counseling. When did you start using that practice? How did it come to your attention that it could be useful?

A. I guess it would be as my own two sons were growing up in their preadolescent and adolescent years, that they had normal problems at that age, unable to communicate and perhaps not being able to as well as they would like; and massaging their backs and legs in order to relax them, it helped a great deal in our communication. We became very close, and we're still very close today. They grew up to be fine Christian young men.

Q. Now, when you—after that experience in your own family, when—how did it come about that you began to use it occasionally in connection with counseling?

A. How did it come about?

Q. That you began to use it sometimes in counseling people?

A. Oh. Well, I find that people, were uptight and a little bit fearful of what is going on. People are, at first, in counseling somewhat fearful. It helps to relax them and helps them to communicate.

Q. In other words, if a person in counseling seems to be having trouble telling you what's wrong or going about what's needed in order to help themselves and have you help them, you have found that on some occasions massage will cause them to relax and communicate better?

A. Yes, sir, that's correct.

Wolfe also described massaging another young counselee and maintained that "the whole purpose of it was for the purpose of concentrating on communication." Similarly, Wolfe testified that he "probably" suggested to an additional young counselee that he remove his pants "because through denim jeans and hard fabrics you don't get contact, and the whole thing here is—the purpose of [massage] is to assist in communication."

Evidenced by the testimony presented at trial, Wolfe never asserted a religious belief for his utilization of massage techniques with counselees.[11] As noted in the dissent to the court of appeals' decision:

According to the record, even though he claimed that he could not remember using

11. Wolfe's attorney, in the course of opening statements, explained Wolfe's use of therapeutic massage techniques in counseling in terms of wholly secular reasons:

And Homer [Wolfe] did learn in his counseling that sometimes if a person was having trouble communicating with him, he couldn't break through the inhibitions or impediments to be able to communicate or receive communications from the counselee, he also found that hugging or massaging would sometimes be of assistance in helping people to relax and communicate. In fact, I think Homer's testimony will be that he had first discovered the success of massaging as a means of helping people to communicate when his own sons were growing up, and at times, as all adolescents or preadolescents do, go through a period of time

when they may feel rebellious or dissatisfied with the acceptance of authority. And there would be times when his sons were not able to respond to efforts to discuss things and bring them out into the open, and he found that if he would massage them, it helped them to relax, and then they were able to communicate in many things that might have otherwise become problems that we hear about so much of teenagers, who not only become rebellious but would act on their rebellion. Those circumstances were averted in Homer's family, and he had a very happy married life, and his sons were happy and grew up to be happy men, who now have happy families of their own, because Homer had the wisdom to help them to communicate.

massage on the minor plaintiff, Wolfe explained that he used massage to assist his counselees in communicating their problems to him so he could help them. Since he believed human touch to be one of the best methods of communication between people, he chose this type of massage to help counselees relax and, consequently, communicate more freely *with him.*

Thus, although his ultimate goal in spiritual counseling was for counselees to receive help from God in resolving their problems, by Wolfe's own testimony, his choice to use massage with children had no biblical, doctrinal, or spiritual basis, justification, or underpinning. Despite the religious setting, the described massage technique simply reflects Wolfe's choice of a relaxation and communication method between himself and his counselees.

Id. at 236 (Davidson, J., dissenting) (emphasis in original).[12] We agree with those observations and conclusions.

### B. *First Amendment Defense of Bear Valley*

■ Regardless of any alleged religious basis for Wolfe's decision to treat young counselees with therapeutic massage, Bear Valley contends that it is entitled to First Amendment protection for its actions in hiring, supervising, disciplining and ultimately discharging Wolfe. We disagree, as did the court of appeals. *See DeBose,* 890 P.2d at 221. In *Van Osdol v. Vogt,* 908 P.2d 1122, 1128 (Colo.1996), we held that "[t]he decision to hire or discharge a minister is itself inextricable from religious doctrine." However, we took care to distinguish internal hiring disputes within religious organizations from general negligence claims filed by injured third parties:

> While claims for illegal hiring or discharge of a minister inevitably involve religious doctrine, that is not the case for a claim of negligent hiring of a minister. The claim of negligent hiring is brought after an employee has harmed a third party through his or her office of employment. An employer is found liable for negligent hiring if, at the time of hiring, the employer had reason to believe that hiring this person would create an undue risk of harm to others. *Connes v. Molalla Transp. System, Inc.,* 831 P.2d 1316, 1321 (Colo.1992); Restatement (Second) of Agency § 213 cmt. d (1958). Hence, the court does not inquire into the employer's broad reasons for choosing this particular employee for the position, but instead looks to whether the specific danger which ultimately manifested itself could have reasonably been foreseen at the time of hiring. This inquiry, even when applied to a minister employee, is so limited and factually based that it can be accomplished with no inquiry into religious beliefs. *See Moses v. Diocese of Colo.,* 863 P.2d 310, 320–21 (Colo. 1993) (holding that although courts must not become embroiled in interpreting or weighing church doctrine, a claim of negligent hiring of a minister is actionable because it does not require such interpretation or weighing of religious belief but instead is merely application of a secular

---

**12.** In view of our determination that Wolfe never asserted a religious belief for his utilization of massage techniques with young counselees, we will not address several arguments of the parties, including whether (1) Wolfe engaged in religious "conduct" or "belief," *compare DeBose v. Bear Valley Church of Christ,* 890 P.2d 214, 220 (Colo. App.1994) *with DeBose,* 890 P.2d at 236–38 (Davidson, J., dissenting), and any resulting implications; (2) the trial court was obligated to provide the jury with a First Amendment instruction that was not tendered by the defendants; (3) the torts of breach of fiduciary duty and outrageous conduct are religion-neutral laws according to *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 876–82, 110 S.Ct. 1595, 1598–1602, 108 L.Ed.2d 876 (1990), and *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 540–42, 113 S.Ct. 2217, 2230–32, 124 L.Ed.2d 472 (1993), and any resulting implications; and (4) the compelling state interest test required by the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb (1993), is constitutional and supersedes *Smith,* and if so, whether we could apply RFRA to this case retroactively, *but see Van Osdol v. Vogt,* 908 P.2d 1122, 1130 n. 12 (Colo. 1996) (RFRA inapplicable to events preceding its passage).

standard to secular conduct), *cert. denied,* —— U.S. ——, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994).

*Van Osdol,* 908 P.2d at 1132–33 n. 17. As we noted in *Van Osdol, id.,* courts may review an injured third party's claim that a religious institution negligently hired, supervised, or failed to discharge one of its employees without implicating or running afoul of the First Amendment. *See, e.g., Moses,* 863 P.2d at 321, 329–31 ("Tenantry's claims in this case do not ·involve disputes within the church.. . ").

### III. *Expert Testimony Issues*

The court of appeals held that the trial court erred in admitting certain expert testimony, and concluded that the admission of such testimony constituted prejudicial error. *DeBose,* 890 P.2d at 224, 228. The court determined that the tendered expert testimony was prejudicial for three reasons. *Id.* at 227–28. First, the court held that a portion of the testimony was irrelevant. *Id.* at 227. "[T]here was no evidence that Wolfe asked the minor to compare his genitals to photographs in any book.. . . At best, it related to incidents allegedly occurring during sessions with other counselees." *Id.* Second, the court determined that some of the testimony presented the jury with an inquiry prohibited by the First Amendment, i.e., "whether Wolfe's techniques were, in fact, valid from a Biblical standpoint." *Id.* Third, the court held that some of the testimony provided the jurors with professional standards for both secular and pastoral therapeutic counseling. *Id.* The court concluded that a secular standard was irrelevant in the pastoral counseling context, and that a pastoral standard impermissibly allowed the jurors to render a decision based on "clergy malpractice." *Id.* The court also noted that the prejudicial impact of the expert testimony was "exacerbated" by the trial court's failure

to instruct the jury that Wolfe might be insulated from liability pursuant to the First Amendment. *Id.* We do not agree that the trial court erred in admitting the expert testimony, and will address each of the court of appeals' concerns in turn.[13]

### A.

■ First, the court of appeals incorrectly concluded that the expert testimony concerning Wolfe's alleged examination of a young counselee's genitals was "irrelevant." *Id.* at 227. The testimony at issue focused on the accusations of the Wygals' son. The appropriateness of the therapy techniques Wolfe used on the Wygals' son directly related to questions of (1) whether Bear Valley was on notice of alleged improprieties in Wolfe's practice but continued to allow Wolfe to see other counselees, including the DeBose child, and (2) whether Bear Valley could have prevented reasonably foreseeable harm to DeBose. *See Destefano,* 763 P.2d at 288 ("a person who knows or should have known that an employee's conduct would subject third parties to an unreasonable risk of harm may be directly liable to third parties for harm proximately caused by his conduct") (footnote omitted). The DeBoses' attorney offered the expert in part as one qualified to render opinions on "responsibility of supervision in church settings and avoiding reasonable foreseeable injury." The trial court took care to preface the introduction of this testimony with extensive and repeated cautionary instructions, limiting the evidentiary use of the testimony to the relevant issue of notice as it relates to prevention of reasonably foreseeable harm:

> [DeBoses' attorney, in sidebar discussion with court]: The testimony you're about to hear may be used for the purpose of showing notice
>
> . . . .
>
> The Court: Okay. I'll make an instruction, but you can make further record if you need to.

Jurors, you have already heard some references to statements or testimony of two individuals, Mr. and Mrs. Gary Wygal, W-y-g-a-l, and this witness is about to refer to statements that they allegedly made involving themselves or their children, as the case may be. This is one of those situations where evidence can be admitted for one purpose, but not for another purpose, and is an appropriate time for me to caution you about this particular type of testimony. I mentioned this yesterday as a possibility.

We have two defendants in this case. We have Homer Wolfe, and we have the Bear Valley Church of Christ. There may be a time when evidence would be allowed as against one of the Defendants, but not the other Defendant. There may be a time when the evidence is allowed as against both Defendants, but only for a specific purpose.

The Defendants dispute these so-called—using [Wolfe's counsel's] language—other acts that are alleged to have occurred or taken place by Homer Wolfe. Other acts meaning, other reportedly improper acts, which are of a nature—a similar nature as what Plaintiffs in this case assert happened. We are not here to determine whether these other acts, in fact, occurred or not. They are disputed. That is not what this case is about.

I am permitting this testimony with respect to what the Wygals informed the church about—or at least about their concerns, for the limited purpose of allowing Plaintiff to present evidence, and whether you accept or reject it is your choice, but allow the Plaintiff to present evidence that the church was aware of possible problems involving Homer Wolfe's counseling. So it is being admitted for the purpose of what the church knew and when.

It's what we call—we lawyers call a notice issue. The fact that there's testimony that these things occurred does not mean that they did, in fact, occur, because that is essentially hearsay. We don't have, for instance, I think, the son coming into court to say what did or did not happen to him. So it's important that you understand the fine evidentiary line that we are drawing here.

. . . .

. . . Again, jurors, I want to emphasize that these allegations are not being presented to you for the truth of the matter asserted. It is simply information which was available to the church and it goes to the issue of notice, which you'll hear more about in the instructions. It is disputed whether these actions actually occurred regarding the Wygal child or children.

. . . .

[DeBoses' attorney]: Could you explain to the jury, without using any names, with the exception of Mr. Wolfe's name, how he applied [a book entitled "The Gift of Sex"] to therapy?

[Wolfe's attorney]: I object. I object on the grounds that it has to apply to [the Debose child] or Denise DeBose in order to have any relevance to this case.

[DeBoses' attorney]: Your Honor, we're talking about the reasonableness or unreasonableness of his counseling and whether or not the Elders should have known. Your Honor, if you'll allow me to make a little bit more of a foundation.

[The Court initially sustained the objection but, after additional foundation evidence and argument, permitted Debose's attorney to proceed.]

[Mr. Schoener]: Could you restate your question? I'm sorry.

[DeBoses' attorney]: Is there anything about the way that Homer Wolfe used *The Gift of Sex* in therapy that was dangerous?

[Mr. Schoener]: Yes.

[DeBoses' attorney]: Describe that to the jury.

[Mr. Schoener]: The notion of having people compare their genitals to those in the book to see if they've been properly

circumcised, I think, is not something that's legitimate counseling or likely to be helpful. It's quite likely to be confusing and harmful, particularly in the pastoral counseling context.

The trial court took the additional step of instructing the jurors in writing at the conclusion of the case that "[e]vidence from or regarding [the Wygals' son] ... may be considered only as evidence for the purpose of showing notice to the Church, but you should not consider it as evidence for any other purpose." Jury Instruction No. 12.

We hold that the court of appeals erred in determining that the expert witness testimony was "irrelevant" and "prejudicial" in applicable part. *DeBose*, 890 P.2d at 224–28. The notice and foreseeability issues directly related to the DeBoses' theories of the case, embodied in the court's instructions to the jury regarding the DeBoses' claim of negligent hiring or supervision:

> Negligence as to negligent hiring or supervision means a failure to do an act which a reasonably careful Church employer would do, or the doing of an act which a reasonably careful Church employer would not do, under the same or similar circumstances, to protect others from harm.
>
> . . . .
>
> The negligence, if any, of the defendant Bear Valley is not a cause of any injuries to either plaintiff, unless injury to a person in the plaintiff's situation was a reasonably foreseeable consequence of that negligence. The exact precise injury need not

have been foreseeable, but it is sufficient if a reasonably careful person, under the same or similar circumstances, would have anticipated that injury to a person in the plaintiff's situation might result from the defendant's conduct.

Jury Instructions Nos. 18, 23. We conclude that the expert testimony concerning the Wygals' accusations was relevant and properly admitted on the question of whether Bear Valley had the requisite notice to prevent reasonably foreseeable harm to the DeBose child.[14]

## B.

Second, the court of appeals incorrectly determined that some of the testimony presented the jury with an inquiry prohibited by the First Amendment. *DeBose*, 890 P.2d at 227. The court of appeals held:

> [S]ome of this testimony called into question the validity of Wolfe's beliefs concerning the efficacy of touching, which he claimed to be grounded in his religious principles. To the extent that such testimony was intended to present a jury question as to whether Wolfe's techniques were, in fact, valid from a Biblical standpoint, the First amendment prohibited its consideration for this purpose.

*Id.* (citation omitted). The court of appeals premised its criticism on the conclusion that Wolfe claimed a religious basis for his use of therapeutic massage with young counselees. *Id.* However, as previously noted, *supra* part II(A)(2), Wolfe never presented the jury

14. Indeed, Bear Valley highlights in a brief the limited purpose, i.e., notice and foreseeability, that this testimony served in summarizing the testimony under a heading entitled "The Setting of Secular Standards for Pastoral Counseling of Minors is Barred by the First Amendment:"

The trial court permitted the DeBoses to put on the following evidence involving the church's clergy handling activity by the Elders: Wolfe was hired by the church without adequate investigation; Wolfe was not qualified to counsel; Wolfe's methods were improper; Wolfe was not equipped to counsel emotional matters; Wolfe improperly touched people; Wolfe required a qualified supervisor; no one at the church was qualified to supervise Wolfe; the Elders' supervision resulted in harm by Wolfe; the Elders acted improperly in processing the Wygal complaint; the Elders did not investigate the Wygal complaint properly; the Elders improperly defined Wolfe's job duties; the church improperly defined the counseling service of Wolfe; the church failed to inform the congregation of Wygals' complaint; and the church failed to properly advise the congregation upon terminating Wolfe.

Answer/Reply Brief of Bear Valley at 27–28, *Bear Valley v. DeBose*, (Jan. 26, 1996) (No. 95SC42) (citations to record omitted).

with a religious basis for his use of massage techniques with counselees but rather explained his use of massage in terms of secular rationale. We disagree with the court of appeals because the jury never had to consider whether Wolfe's beliefs concerning the efficacy of touching were grounded in his religious principles. *See DeBose*, 890 P.2d at 227.

### C.

■ Third, the court of appeals incorrectly held that some of the testimony provided the jurors with professional standards for both secular and pastoral therapeutic counseling, in effect subjecting Wolfe to a claim for clergy malpractice. *Id.* The court explained:

[T]his testimony sought to establish a professional standard for *pastoral* counseling, *i.e.*, that a minor counselee should never be touched by any counselor. And, unless the proffering of such testimony was intended to allow the jurors to determine that Wolfe violated this professional standard, it was irrelevant to any issue that they were to decide. But, to allow the jurors to assess liability against Wolfe for violating this standard was tantamount to imposing liability for "malpractice," *i.e.*, for the violation of a professional standard of conduct.

*DeBose*, 890 P.2d at 227. The court then noted that the trial court "exacerbated" the prejudicial impact of the expert testimony by failing to instruct the jury that the First Amendment might insulate Wolfe from liability. *Id.* Again, we disagree.

The testimony concerning Wolfe's use of therapeutic massage with young counselees was not directed toward establishing an impermissible claim for clergy malpractice. *See Moses*, 863 P.2d at 321 n. 13 ("In Colorado, breach of fiduciary duty is actionable, clergy malpractice is not.") (citation omitted). Instead, the testimony potentially supported the DeBoses' claim that Bear Valley should have been aware that Wolfe was utilizing counseling techniques with young boys that did not conform with Bear Valley's own counseling expectations. According to one of the plaintiffs' theories of the case, if Bear Valley had notice that Wolfe employed counseling techniques with the Wygal youth that were allegedly inappropriate, the Bear Valley elders could have prevented any harm that the DeBose child experienced subsequent to the initial complaint by the Wygals. *See supra* part III(A). The trial court appropriately allowed expert testimony relating to the propriety of Wolfe's therapeutic massage technique for this limited purpose.[15]

■ The court of appeals also erred in analyzing the testimony of another expert witness, Reverend Marie Fortune, with regard to the incident concerning the Wygals' son. The court of appeals characterized the testimony as evidence impermissibly directed toward a professional standard of care for pastoral counselors:

[O]ver objection, this witness was also allowed to testify that "nudity or partial nudity" is "inappropriate in the pastoral relationship." This witness said that, while such might be appropriate in either a "medical setting" or in a "situation with a licensed massage therapist," such activity is "unnecessary" and "inappropriate" in either a therapeutic or a pastoral relationship.

*DeBose*, 890 P.2d at 226. In fact, the relevant testimony was directly applicable to the questions of notice and reasonably foreseeable harm. The relevant testimony reads:

[DeBoses' attorney]: Do you have an opinion within a reasonable degree of certainty as to whether or not the Bear Valley Church of Christ failed in its supervision of Homer Wolfe in preventing reasonable foreseeable harm?

[Reverend Fortune]: Yes. I think that was inadequate.

---

15. In any case, we do not believe that the alleged error was "exacerbated" in any way by the trial court's refusal to provide the jury with an instruction regarding Wolfe's First Amendment defense. Neither Wolfe nor Bear Valley contended that the counseling techniques to which the DeBoses objected were grounded in religious belief. *See supra* part II(A)(2).

[DeBoses' attorney]: Explain to the jury in what way they failed?

[Reverend Fortune]: As best I can. I could tell, again, from the depositions there was no supervision of Mr. Wolfe by anyone qualified to supervise the work that he was doing. There seemed to be confusion about the nature of the work that he was doing and some concern expressed by the Elders as to whether he was overstepping his—the bounds of his job. But it seemed to me that that concern was not pursued in terms of—particularly the allegations—but it was not pursued in any way that was effectively supervising him regarding that.

My other concern that has to do with both the hiring and supervision and the lack of qualifications for the job that he was asked to do. As I recall, the only reference to qualifications had to do with the fact that he had been a preacher for a number of years and that he was a former director of education at the churches he served previously. In my opinion, neither of these things qualified him for the position that he was being asked to serve in. So that, combined with lack of oversight and supervision, seemed to me inadequate.

[DeBoses' attorney]: When the allegations of [the Wygals' son] were brought to the Elders in either May or June of 1987, what should they have done?

[Reverend Fortune]: In my opinion, they should have investigated further beyond those allegations. It would have been advisable, it seems to me, for them to have suspended Mr. Wolfe's counseling work that he was doing until an investigation could have been completed, so that there would not have been any chance for further access to persons who might possibly have been harmed.

. . . .

[DeBoses' attorney]: . . . Reverend Fortune, where a minister admits to employing nudity and partial nudity in the counseling setting, is injury to the counselee reasonably foreseeable?

[Reverend Fortune]: It seems to me that it is, because that is inappropriate in the pastoral relationship.

[DeBoses' attorney]: Why is that?

[Wolfe's attorney]: Your honor, I object to the testimony about the standard of care in the pastoral relationship on the same grounds.

[DeBoses' attorney]: Your honor—

The Court: Objection overruled.

[DeBoses' attorney]: Why is that inappropriate?

[Reverend Fortune]: In my opinion there are two situations, it seems to me, in which disrobing is appropriate, and there may be others, but it seems to me, two. In particular, in a helping relationship where we are seeking out a professional to assist us with a particular problem. One would be a medical setting, and the other would be a situation with a licensed massage therapist.

[DeBoses' attorney]: Beyond that, in any counseling—therapeutic, pastoral—relationship, disrobing is inappropriate?

[Reverend Fortune]: It's unnecessary and it's inappropriate.

The plaintiffs specifically presented this witness "as an expert in theology *relative* to procedures and practices reasonably necessary in a church setting to prevent foreseeable harm." (Emphasis added.) *But cf. DeBose*, 890 P.2d at 225 (incorrectly stating that expert "was tendered as an 'expert in theology' *and* upon 'procedures and practices in church settings necessary to prevent reasonably foreseeable harm.'") (emphasis added). Again, neither Wolfe nor Bear Valley contended that the use of nudity as a counseling technique had roots in religious belief. We do not view Reverend Fortune's testimony as directed toward a standard of care for pastoral counselors. Rather, it was properly received as relevant to notice and reasonably foreseeable harm.

### IV. *Inconsistent or Duplicative Jury Awards*

■ Finally, Wolfe and Bear Valley contend that the jury verdicts were either incon-

sistent or duplicative. In reviewing this claim, the court of appeals acknowledged that "[t]he record here does not contain a transcript of any discussion with respect to the instructions or verdict forms. Hence, it does not reflect any objection interposed by defendants to the verdict forms." *DeBose*, 890 P.2d at 223. Nevertheless, the court of appeals addressed the defendants' claims for the following reason:

> However, after the verdicts were received, defendants sought to have them set aside, claiming that they resulted in the award of duplicate damages. Plaintiffs have not asserted, either in the trial court or here, that defendants' failure to object to the form of the verdicts prevented them from raising this issue, and the trial court addressed the merits of defendants' assertion. We shall do likewise. . . .

*Id.* We disagree with the court of appeals' analysis of the record, *id.*, and conclude that the defendants did not preserve their contention adequately for appellate review.

We agree with the court of appeals that the record does not contain any evidence that the defendants entered objections to the verdict forms or instructions, prior to submission to the jury, on the basis that the instructions allowed the jury to assess inconsistent or duplicative damages. *Id.* Our review of the record indicates that the defendants raised the issue of duplicative or inconsistent verdicts for the first time in the course of post-verdict motions. However, the DeBoses responded to the defendants' post-trial contention by asserting that the defendants never raised the issue at trial, and the trial court summarily rejected the defendants' claim of inconsistent and duplicative damages in part because of the DeBoses' assertion that the defendants did not adequately preserve the issue.

In a memorandum in support of its post-trial motions,[16] Bear Valley asserted that the jury verdict forms resulted in conflicting and duplicative verdicts. Bear Valley did not assert in the memorandum that either defendant objected to the jury instructions or verdict forms prior to submission to the jury. Similarly, Wolfe filed a post-trial motion for an amendment of the judgment, claiming that the jury verdicts were duplicative. Again, Wolfe did not contend that either defendant objected to the verdict forms or instructions prior to judgment, even though his post-trial motion contained an entire section devoted to a motion for new trial based on "Defendant Wolfe's Tendered and Refused Jury Instructions." Defendant Wolfe's Post-Trial Motions at 18–19, 31–34, *DeBose v. Wolfe*, (Denver District Court, Sept. 10, 1992) (No. 91CV4346).

The defendants never argued in the district court that they objected to the verdict forms and instructions on the basis that they were inconsistent or duplicative prior to submission to the jury, and the court of appeals correctly concluded that the record does not contain any evidence of such objections. *DeBose*, 890 P.2d at 223. However, the court of appeals misconstrued the procedural history of the case in determining that "[p]laintiffs have not asserted, either in the trial court or here, that defendants' failure to object to the form of the verdicts prevented them from raising this issue, and the trial court addressed the merits of defendants' assertion." *Id.* Indeed, the DeBoses responded to Bear Valley's post-trial assertion that the jury instructions and forms resulted in duplicative or inconsistent verdicts by arguing, in relevant part:

> [Bear Valley] did not argue that the verdict forms were insufficient prior to tendering them to the jury. In fact, [Bear Valley] asserted a position which required that simple verdict forms originally tendered by [the DeBoses] be revised into multiple forms with multiple sets of damage figures. [Bear Valley] then agreed to the forms as revised.

16. Bear Valley filed a post-trial motion seeking, either in conjunction or in the alternative, a new trial, judgment notwithstanding the verdict, amendment of the judgment, and remittitur. In its post-trial motion, Bear Valley also adopted all of the claims that Wolfe asserted in his own post-trial motion.

Plaintiff DeBoses' Response to Defendant Bear Valley Church of Christ's Motion for New Trial, and/or Judgment Notwithstanding the Verdict and/or Amendment of Judgment and/or for Remittitur at 8, *DeBose v. Wolfe,* (Denver District Court, Sept. 15, 1992) (No. 91CV4346) (parenthetical reference to attached exhibits omitted). The DeBoses incorporated this argument into their response to Wolfe's post-trial assertion that the verdicts were duplicative or inconsistent. The trial court, having presided over the trial and having heard any objections by counsel to the jury verdict forms and instructions, agreed with the DeBoses' response to Wolfe's post-trial argument that the verdict forms allowed for duplicative or inconsistent verdicts, and refused to address Wolfe's substantive contention in summarily denying Wolfe's post-trial motions:

> Defendant Wolfe's Post–Trial Motions are denied for the reasons previously articulated by the Court during the trial of the within action, as well as for the reasons articulated by [the DeBoses] in their Response to Defendant Wolfe's Post–Trial Motions.

In short, contrary to the court of appeals' conclusions, the DeBoses *did* argue "that defendants' failure to object [prior to judgment] to the form of the verdicts prevented them from raising this issue," *see DeBose,* 890 P.2d at 223, and the trial court accepted that argument in denying the defendants' post-trial motions.[17]

■ Based on the foregoing procedural history, culled from the record before this court, we conclude that the defendants did not preserve any objections to the jury verdict instructions or forms for the purposes of

appellate review. According to our rules of civil procedure, a party cannot seek appellate review of the propriety of a jury instruction unless counsel tenders such an objection prior to the court's presentation of the instructions to the jury:

> All instructions shall be submitted to the parties, who shall make *all* objections thereto *before* they are given to the jury. *Only the grounds so specified* shall be considered on motion for a new trial or on appeal or certiorari.

C.R.C.P. 51 (emphasis added). Relying on C.R.C.P. 51, we have stated that "[c]ounsel has the duty to examine the instructions, and his failure to detect errors and call the trial court's attention to them ordinarily operates as a waiver of the objection." *Scheer v. Cromwell,* 158 Colo. 427, 429, 407 P.2d 344, 345 (1965) (citing *Gilligan v. Blakesley,* 93 Colo. 370, 380, 26 P.2d 808, 812 (1933)); accord, e.g., *Blakesley,* 93 Colo. at 380, 26 P.2d at 812 ("[I]t is the duty of counsel to examine—or at least to listen to the reading of—the instructions at the time they are given; and, by not detecting errors promptly and not calling the trial court's attention thereto, so as to enable the appropriate correction to be made, the point must ordinarily be deemed waived."). As we noted in *Cromwell,* "[t]he 'contemporaneous objection' rule has a salutary purpose in the orderly administration of justice. Its principle is to enable trial judges to clarify or correct misleading or erroneous instructions before they are given to a jury, and thereby prevent costly retrials necessitated by obvious and prejudicial error." *Cromwell,* 158 Colo. at 429, 407 P.2d at 345 (citing *McDonald v. Jarka Corp.,* 144 F.2d 53 (2d Cir.1944); *United States v. Monroe,* 164 F.2d 471 (2d Cir.1947)).

17. The court of appeals also erred in concluding that the "[p]laintiffs have not asserted, either in the trial court or here, that defendants' failure to object to the form of the verdicts prevented them from raising this issue," because the plaintiffs did raise this objection in their briefs to the court of appeals. *DeBose v. Bear Valley Church of Christ,* 890 P.2d 214, 223 (Colo.App.1994). In two separate documents filed with the court of appeals prior to its decision, the plaintiffs responded to the defendants' duplicative damages claim by arguing that "[n]one of the instructions concerning damages or the verdict forms were objected to by either Defendant." [Plaintiff DeBoses] Answer Brief to Defendant–Appellant Homer Wolfe at 37, *DeBose v. Wolfe,* (Colorado Court of Appeals, June 4, 1993) (No. 92CA001929); [Plaintiff DeBoses'] Answer Brief to Defendant–Appellant Bear Valley and Opening Brief on Cross Appeal at 44, *DeBose v. Wolfe,* (Colorado Court of Appeals, May 14, 1993) (No. 92CA001929).

We do not believe that this is one of the "rare" cases, where equitable concerns might warrant appellate review despite the lack of a contemporaneous objection to the jury instructions. *See Cromwell,* 158 Colo. at 429–30, 407 P.2d at 345. The trial court specifically cautioned the jurors to avoid duplicative damages by the written jury instructions:

> The plaintiffs have sued for the same or similar injuries and losses on different claims for relief.
>
> . . . .
>
> If you find for a plaintiff on more than one claim for relief, you may award damages only once for the same injuries.

Jury Instruction No. 51A (as amended by the trial court in answer to a jury communication during deliberations). The verdict form for the DeBose child's negligence claim against Bear Valley also contained the admonition that the jury must "not include an award for damages for which [the DeBose child] has been compensated under any other theory." Similarly, the verdict form for the DeBose child's outrageous conduct claims against both Wolfe and Bear Valley contained two separate warnings that the jury could "not include damages which you have assessed under another theory of recovery." The jury also received like warnings under two claims that it rejected on statute of limitation grounds. As noted in the dissent to the court of appeals' opinion, "[t]he jury must be presumed to have understood and followed the court's instructions." *DeBose,* 890 P.2d at 239 (Davidson, J., dissenting) (citing *Schmutz v. Bolles,* 800 P.2d 1307, 1315 (Colo. 1990)); *accord, e.g., People v. Smith,* 620 P.2d 232, 239 (Colo.1980); *James v. James,* 85 Colo. 154, 165, 274 P. 816, 820 (1929). The trial court recognized this proposition in granting the DeBoses' "Request for Entry of Judgment," when it again rejected the defendants' post-trial duplicative damages argument and held that "the jury was specifically instructed that it could not award duplicate damages, and it must be presumed the jury followed those instructions and determined

damages accordingly." (Citing *Roberts v. C & M Ready Mix Concrete Co.,* 767 P.2d 769 (Colo.App.1988); jury instruction citation omitted.) In view of these explicit jury instructions, we see no need to consider whether an equitable exception to the contemporaneous objection rule is warranted or even allowed under our rule of civil procedure that requires a party to enter any objections to jury instructions prior to the jury's receipt of those instructions. *See* C.R.C.P. 51.

### V.

Aside from the aforementioned issues, the court of appeals concluded that the evidence was sufficient to sustain the jury verdicts. *DeBose,* 890 P.2d at 218, 221. For the foregoing reasons, we reverse the judgment of the court of appeals and remand with instructions to reinstate the judgment of the trial court, entered on the verdicts of the jury.